# ARCHAMBAULT et al. v. JOSEPH BLANCHARD et al., Appellants.

### Division Two, July 3, 1906.

1. **WILL: Incapacity: Tests.**  In determining whether the testator had sufficient capacity to make a will, the standard of the mental capacity required should be kept steadily in view, which -is:  the testator, without the aid of other persons, must have had sufficient understanding to comprehend the nature of the transaction he was engaged in, the nature and extent of his property and the persons to whom he desired to give it.

2. ———: ———: **Eccentricities: Drunkenness.**  Testator had been a very successful and sound-minded man up to within a few months of his death at the age of 74.  The will was executed thirteen days before his death, and his death was due to accident.  He had for a month or more previously indulged excessively in the use of whiskey; his mind was bright and clear in the forenoon, but the whiskey made him stupid and sullen in the afternoon; he wrote checks and transacted other business in the forenoon; in the afternoon he occasionally exhibited violent temper, sometimes used profane language, engaged in silly laughs and speeches, and sometimes talked incoherently, but all the witnesses testified that when he was in a stupid or intoxicated condition he would transact no business.  About the time the will was made he had business dealings with a large number of persons, some of whom had known him for years, and all pronounced him on such occasions to be as sound-minded as any one.  One physician, in response to a hypothetical case purporting to be based on the testimony, testified that he was not sound-minded, and numerous others who had treated him and knew him well testified to the contrary.  Five months before the will was drawn  he had been struck by a cable car, and some witnesses testified that after that his mind was never the same.  He manifested eccentricities of character, such as disbelief in religion, preachers and lawyers, and in his later days slovenliness of dress and appearance about his house, sometimes clothed in his

night apparel or not properly clothed at all. His wife and children had died long before his death. The will was executed by him in his own house in the forenoon, and was drawn by a lawyer from memoranda made by the lawyer in his presence at his dictation. He had previously made eleven wills. The first ones gave property to his sisters or their descendants, but as they died he had others drawn changing the bequests correspondingly. The eleventh was drawn only a short time before the last. It and others before it gave much of his property to the city for a park, and the last differed from them almost wholly in giving the amount intended for the park to charitable institutions. *Held*, that there was no evidence upon which the question of his incapacity could have been submitted to the jury, and the court should have peremptorily directed the jury to find for proponents.

Appeal from Jackson Circuit Court.— *Hon. R. E. Ball,* Special Judge.

REVERSED AND REMANDED (*with directions*).

*Johnson & Lucas* and *C. O. Tichenor* for appellants; *A. M. Allen, Karnes, New & Krauthoff, Harkless, Crysler & Histed* and *Gage, Ladd & Small* of counsel.

. (1) (a) The will was properly executed and attested. No formal request of witnesses to attest, nor formal declaration by testator that it was his will, was necessary. Testator dictated the will, requested that witnesses be procured, and in their presence signed it, and they attested it in his presence. This was sufficient. Hughes v. Rader, 183 Mo. 701; Martin v. Bowdern, 158 Mo. 389; Schierbaum v. Schemme, 157 Mo. 6. (b) The will having been properly executed and attested, and its provisions being of themselves evidence of testator's mental capacity, which the law also presumes, a prima-facie case of mental capacity was made out. Wood v. Carpenter, 166 Mo. 487; Riggin v. Westminster College, 160 Mo. 579; Jackson v. Hardin, 83

Mo. 182. (2) (a) If mental capacity is shown to have existed, at the very time of the execution of the will, it is sufficient. Hamon v. Hamon, 180 Mo. 691; Von de Veld v. Judy, 143 Mo. 363. (b) There was no substantial evidence that testator was of unsound mind at the time of the execution of the will, or that he did not have mental capacity to execute it. Story v. Story, 188 Mo. 110; Catholic University v. O'Brien, 181 Mo. 68; Hamon v. Hamon, 180 Mo. 685; Crowson v. Crowson, 172 Mo. 700; Wood v. Carpenter, 166 Mo. 465; Kirschman v. Scott, 166 Mo. 214; Riggin v. Westminster College, 160 Mo. 570; Martin v. Bowdern, 158 Mo. 391; Fulbright v. Perry Co., 145 Mo. 432; Von de Veld v. Judy, 143 Mo. 348; Cash v. Lust, 142 Mo. 630; Jackson v. Hardin, 83 Mo. 175. (c) Expert testimony, as to a man's legal capacity, based on hypothetical questions, is of little weight. Riley v. Sherwood, 144 Mo. 363; Leach v. Burr, 188 U. S. 515. (3) Instructions 1, 2 and 7, given at the request of respondents, were erroneous, as they place the burden of proof on defendants. Riggin v. Westminster College, 160 Mo. 579; Sehr v. Lindeman, 153 Mo. 288; Fulbright v. Perry Co., 145 Mo. 442; McFadin v. Catron, 138 Mo. 213; Woodford v. Buckner, 63 S. W. 618. (4) The arguments of counsel for respondents to the jury, on the question of undue influence, which had been withdrawn from the jury by the court, were prejudicial to appellants. Ritter v. Bank, 87 Mo. 574; Haynes v. Trenton, 108 Mo. 133; Evans v. Trenton, 112 Mo. 390; Williams v. Railroad, 123 Mo. 586.

*George E. Miller, F. E. Dycus, Frank P. Sebree, Roland Hughes, Thomas A. Witten* and *H. C. Mc-Dougal* for respondents.

(1) (a) No attack is here made upon the proof of formal execution of the will; the trial court admitted it in evidence. (b) This will "shows on its face" no

presumption of mental capacity. The proof shows that all its provisions were substantially copied from wills previously executed, except two; and that these two changes were made by others, not by Benoist. Hence "on its face" it is of no value upon any issue here presented. (2) (a) Their demurrer to the evidence was properly overruled. The evidence was amply sufficient to support the verdict of the jury that the alleged will was not the will of Joseph Benoist upon the issue of a lack of testamentary capacity. Aylward v. Briggs, 145 Mo. 604; Gordon v. Burris, 153 Mo. 223; Coates v. Lynch, 152 Mo. 159; Farmer v. Farmer, 129 Mo. 501; Giltman v. Turner (Ky.), 85 S. W. 186; Irish v. Smith (Pa.), 11 Am. Dec. 648; Clark v. Fisher (N. Y.), 19 Am. Dec. 404; In re Cochran's Will (Ky.), 15 Am. Dec. 116; Green v. Green, 145 Ill. 275; Rathjen v. Merrell, 80 Pac. 755; Hegency v. Head, 126 Mo. 619; Narrot v. Scott, 76 N. W. 720; Roberts v. Bartlett, 190 Mo. 680. (b) Again: An action to contest a will is a law case, and where there is a conflict in the evidence, this court will not review it and determine the weight of the evidence. Secs. 4622, 4623, R. S. 1899; Bank v. Wood, 124 Mo. 72; Moore v. McNulty, 164 Mo. 119; Bank v. Armstrong, 92 Mo. 280; Crossan v. Crossan, 169 Mo. 119; Sayre v. Trustees, etc., 192 Mo. 95; Railroad v. Stout, 17 Wall. 663; 3 Grah. & Wat. on New Trials, 1206. (3) (a) The burden of proof is upon the proponents of the will to establish, by a preponderance of the evidence, the testamentary capacity of the testator at the time of the execution of the will. Norton v. Paxton, 110 Mo. 456; Maddox v. Maddox, 114 Mo. 35; Benoist v. Murrin, 58 Mo. 322; Lamb, Admr., v. Helm, Admr., 56 Mo. 432; Sawyer v. White, 122 Fed. 227; Crowninshield v. Crowninshield (Mass.), 2 Gray 524; McMahan v. McMahan, 17 W. Va. 681; Baldwin v. Parker, 99 Mass. 79; Schouler on Wills, sec. 174; Page on Wills, sec. 97. (b) The burden of proof does not shift from one side to the other as the case progresses, but

remains with that party upon whom it devolved at the outset, and the burden must be carried, not through one or more stages of the case, but through the case as a whole. Authorities last above cited and the following: Central Bridge Corp. v. Butler, 68 Mass. (2 Gray) 132; Hindman v. Hird, 62 Mo. 455; Clark v. Hillis, 67 Tex. 148; Scott v. Pettigrew, 72 Tex. 329; Tarbox v. Steamboat Co., 50 Me. 345; Scott v. Wood, 81 Cal. 402; Atkinson v. Goodrich Trans. Co., 31 N. W. 168; Baldwin v. Parker, 99 Mass. 79; Baxter v. Abbott, 7 Am. Dec. 72. (c) Their answers affirm the validity of this will; and by their instructions, appellants assumed the burden of proof as to mental capacity. They cannot here complain of the ruling of the trial court upon this question. Reilly v. Railroad, 94 Mo. 611; Christian v. Ins. Co., 143 Mo. 460.

GANTT, J.—This action was commenced in the circuit court of Jackson county, returnable to the September term, 1900, by the plaintiffs, who are all the heirs at law of Joseph Benoist, deceased, except Joseph Blanchard. Joseph Benoist died August 13, 1899. On August first, 1899, deceased made, executed and published what purported to be his last will and testament and the said paper writing was admitted to probate by the probate court of Jackson county, Missouri. And the defendants, Daniel O'Flaherty, Thomas McNamara and A. M. Allen, appointed therein as executors, duly qualified as such and took charge of his estate. This suit is brought by the plaintiffs to have the said will set aside and adjudged not to be the last will and testament of said Joseph Benoist.

The grounds upon which said will is contested are that the said Joseph Benoist for a long time prior to his death had been, and at the time of the execution of said will was, so addicted to the excessive use of intoxicating liquors and other vicious habits that his mind and memory became and were greatly impaired

and weakened, and plaintiffs allege that said will was not
and is not the last will of said Joseph Benoist, but was
and is null and void for that at the time of making
the same, the said Joseph Benoist was not of sound
mind, nor of disposing memory, but was old and broken
and feeble in both body and mind, and was then men-
tally incapable of making a valid testamentary dis-
position of his estate and property, and that said will
was not in fact his free and unrestricted act or will
for that on account of his said dissipated habits, old
age and mental infirmities, he was unable to and could
not and did not resist the undue influences which were
then and there too far exercised upon and over him by
the beneficiaries named in said purported will, and
especially by members and agents of the Roman Cath-
olic Church, to societies and associations operated and
conducted by and in the interest of which said church,
he attempted, under such undue influence, to bequeath
the bulk of his fortune, and thereby exclude from par-
ticipation therein or enjoyment thereof, the plaintiffs,
who were and are his next of kin, and the natural ob-
jects of his bounty.

Defendants, except Greenberry Davis, Joseph B.
Davis, Francis Marion Darnall, who were duly served
with process, answered, admitting the execution and
proof of the will and affirming its validity and deny-
ing all the other allegations of the petition. The reg-
ular judge of the court being incapacitated by reason
of having been counsel in the case, the Hon. Robert E.
Ball, a member of the Jackson county bar, was duly
selected and elected as a special judge to try the cause,
and he duly qualified as such. The cause was tried
at the September term, 1901, before the court and a
jury, and resulted in a verdict for the plaintiffs; that
the paper writing propounded as the will of the said
Joseph Benoist was not his will. Judgment was en-
tered in accordance with the verdict setting aside the
said paper writing and the probate thereof, and adjudg-

ing the same to be null and void and of no effect as the last will of the said Benoist. In due time the defendants filed their motions for a new trial and in arrest of judgment, and the same were heard and overruled by the court, and thereupon the defendants appealed to this court. After hearing the testimony, the court by its instruction withdrew from the jury the question of undue influence, and no exception or appeal having been taken from that ruling of the court, the only question on this appeal is whether the said Benoist had sufficient mental capacity and memory to make a last will and testament.

The testimony tends to show that Joseph Benoist was possessed of an estate worth in the neighborhood of one hundred and fifty thousand dollars at the time of his death in Kansas City, Missouri, on the 13th of August, 1899. He was found dead at the foot of a stairway leading down in some underground place, and there was a small wound on the back of his head, which wound, it appears, was caused by his falling down the steps. He left a will dated the first day of August, 1899. It was attested by William H. Browne and Milton Campbell, two members of the bar of Jackson county. Benoist was born in 1825, near Montreal, Canada; was reared under humble conditions, and when about eighteen years of age located at St. Louis, Missouri. He seems to have been a man of great energy, and was at different periods a farmer, steamboat captain and merchant. He married, but left no wife or children, as they all died long before he died. He settled in the State of Kansas in 1867 and was merchandising there until he located in Kansas City in 1878, where he remained until his death. In a sketch of his life, written by himself, it appears that he was not a member of any church, and was inclined to be an agnostic. In this sketch, he said of himself: "I am not of a religious turn of mind as it is generally understood nor an ultra moralist. From actual contact with

M. D.'s, LL. D.'s and D. D.'s, I place but little con-
fidence in them because they make their living gener-
ally off of credulous, superstitious people.    Do unto
others as you would wish to be done by is religious
creed enough for me if practically and faithfully car-
ried out.   I have so conducted myself as to hope and
believe that I will not be an outcast in the hereafter,
if there is a future life.   I have always been extremely
liberal in my religious and political views, and don't
think that I ever lost a friend or made an enemy be-
cause of difference in religious or political belief.    I
have always entertained the highest regard and love
for our republican form of government and glory in
being an American citizen, and will die with the sincere
hope in my heart for the welfare and perpetuity of our
free institutions.''

Within the period from 1873 to 1899, Benoist made
thirteen wills.   A brief analysis of these will indicate
the character of the man.   In the first and second, he
gave all of his estate to his kindred, with his half-sister
as his residuary legatee.   In his third and fourth and
fifth wills appears the legacy of $40,000 to the Academy
of the Christian Brothers, entailing upon the said
academy the obligation of paying over annually cer-
tain bequests to his sister Melvina.   This sister, it ap-
pears, died in February, 1894.   In 1895, he made his
sixth will, and in it he recites his settlements and con-
tract with the Academy of the Christian Brothers; re-
vokes all prior legacies to it and gives it the $40,000
complete and absolute at his death.   He then notes the
death of his sisters, Marguerite, Emily and Melvina,
since the making of his will in 1881.   He makes a few
minor bequests to relatives and friends, and gives to
Kansas City, upon the conditions named, a small tract
of land for an industrial home for boys under the age
of eighteen years.   Then for the first time he outlines
his scheme for establishing a free public park in Kan-
sas City to be known as ''Benoist University Park,''

with a proviso that if the city shall not accept the park and carry out the conditions therein named, then it shall forfeit the gift, and the land shall be sold and the proceeds thereof distributed among the bodily heirs of his sisters, Marguerite, Francis and Emily. In his seventh, eighth, ninth, tenth, eleventh and twelfth wills, he gave to certain of his kindred and friends small legacies, and then repeated the provision for the use of the Benoist University Park already noted. In this last will, the one now contested in this proceeding, he gave to certain of his kindred one dollar each; $1,000 to his sister Celina; $1,000 to his friend Mrs. McGowan; several small bequests to personal friends, and then by clauses 12th to 25th inclusive, he gives $66,000 to fourteen different charitable institutions in Kansas City, as follows: To the St. Joseph Female Orphan Asylum, The Kansas City Orphans' Home for Boys, The Little Sisters of the Poor, The Sisters of Loretto, in charge of the Sacred Heart Academy, St. Marguerite's Hospital, to the Old Folks and Orphans Home for Colored People, to the Protestant Home for Aged Women, to the Florence Crittenden Home, to the Children's Home, to the Trustees of the Jewish Woman's Charity Association of Kansas City, $4,000 each; to the Sisters of Mercy, $12,000; to the Sisters of St. Joseph, $2,000; to the Holy Rosary Church, $8,000, for the erection of a school house for the use and benefit of Italians and their descendants, located in Kansas City. He then recites in the 26th article of his will: "During the years 1876 and 1877, I loaned to the Academy of the Christian Brothers, now known as the Christian Brothers College of the city of St. Louis, various sums of money amounting to $40,158.38, to assist it in erecting its college buildings in the city of St. Louis, for which amount I took the notes of said academy as I advanced the money." He then recites that in 1881, he made a will and bequeathed to said academy the full amount of said notes, and whatever real estate and

personal property he might possess at his death, but all upon condition that the academy should by its president or his successor administer his estate and carry out the provisions of said will, to-wit, pay his debts, pay various sums of money, and provide education and maintenance to several beneficiaries named in said will; that later, in 1884, he transferred, set over and delivered to said academy its notes to the amount of $40,000, upon the written agreement between himself and said academy that the academy should pay him six per cent interest on said $40,000 during his lifetime, and comply with and carry out other provisions of said will. He then recites: "Over 18 years have elapsed since I made the said will in 1881, and time has worked radical changes in my surroundings. Nearly all of those whom I provided for in my said will, have passed away. Others have passed the age in which they were to be cared for, and others still are in no need of my assistance, so my death happening now, there would be no charges or liabilities falling upon said academy that would constitute any consideration for said agreement and for these reasons, and for others satisfactory to myself, I have long since revoked and annulled my said will of 1881, and revoked, canceled and annulled any and all bequests in said will contained and in said agreement mentioned, and I do relieve and release to said academy from any and all obligations, charges and undertakings imposed upon it by terms of the will of 1881, and by the terms of a written agreement of February 2, 1884, but I do now hereby confirm, establish, grant, bequeath and devise to the said Academy of the Christian Brotherhood, now known as the Christian Brothers College, as a free gift without conditions, all my right, title, interest and claim to the aforesaid notes of said academy for $40,000 described above, and given to said academy conditionally by said agreement of February 2, 1884, and I regard this as full and sufficient evidence of my friendship and esteem for said

Academy of Christian Brothers, now Christian Brothers College of St. Louis, Missouri.'' And he finally makes said Christian Brothers College of St. Louis his residuary legatee of the residue and remainder of his property in trust to use and apply the entire sum so bequeathed, and by them received, to the purchase of a site for and the erection of a school house in Kansas City, Missouri, and towards a second site in Kansas City. It was stipulated and admitted in evidence that nine of the charitable institutions mentioned in the will as well as the Christian Brothers College of St. Louis, Missouri, were Catholic institutions, conducted by and in charge of Catholics; of the remaining five charities, one was for colored people, another a Jewish women's charitable association, and the will leaves three of these charities unclassified.

It is conceded by both sides that the evidence all tends to show that in the health and strength of his vigorous manhood, Joseph Benoist was a man of strong character with a clear intellect. On the part of the contestants, the contention is that for the last year of his life and especially from the time he was struck and injured by a street car during February, 1899, he had failed rapidly both mentally and physically, and that at the time of his executing the will in contest, he had become so enfeebled as to incapacitate him from executing a valid will. Whereas, on the part of the defendants, it is insisted that the proofs utterly failed to establish any such incapacity or physical weakness, and that the court should have directed a verdict establishing the said paper writing as the last will and testament of said testator. In view of these respective contentions it becomes essential to review and recite substantially the testimony in the cause.

On the part of the contestees, the evidence in chief was as follows:

William H. Browne testified that he was a lawyer and had resided in Kansas City since March, 1886;

knew Milton Campbell, and went with him to Mr. Benoist's residence on the first of August, 1899. He was shown the will in contest and testified that the signature to the said will was Joseph Benoist's as testator and the signature of the witnesses to said paper were his own and Milton Campbell's. He saw Benoist sign it. "He signed it in my presence; after he signed it, I signed down here; had never seen Mr. Benoist before; went at Mr. Campbell's request, he took me as a second attesting witness. In my judgment he, Joseph Benoist, was of sound mind at that time. I talked to him after I was introduced for half or three quarters of an hour. He was sitting in his room and signed at a desk there; he arose from his chair and went to the desk; I signed it there, and then Mr. Campbell signed it. Mr. Campbell and I were both right there in the room in the presence of each other when we signed it. I never saw Mr. Benoist afterwards, that was the first and the last time." On cross-examination he testified he was a native of Ireland, but had been in the United States for thirty-two years and was a Catholic. The old man was sitting there dressed as people usually appear around their houses; had slippers on, possibly a vest, but no coat and was sitting in a rocking chair. The testator was not a very tall man and was quite fleshy, his neck was not very long. I was introduced to him by Mr. Campbell when we first went in, and Mr. Campbell told him that he brought me over there to witness the signing of the will and then we talked a few moments. He said, "Very good, I want you two there to get that will proper; I want you to get it right," and turning to me he said, "Can't trust those lawyers; I want to have everything fixed right while I am here; that is something that I will not be here, and if anything should come up about it, I want it fixed right now, so that everything will be all right." "Mr. Campbell read the will to Mr. Benoist fully, I believe, before it was signed, and before the conversation in which

he expressed his want of confidence in lawyers. I don't remember what Mr. Benoist said when he signed the will, I did not remain there long; just bade him goodbye."

Milton Campbell testified that he had been a practicing lawyer in Kansas City since 1871. That he, Mr. Benoist and Mr. Browne were together at Mr. Benoist's house on the date of the will. He identified his signature as a witness to the paper and also the signature of Browne and Benoist, and testified that the will was signed in his presence. Mr. Benoist was about seventy-two years of age. He testified further that two or three days before it was signed, Thomas Hogan came and said Mr. Benoist wished to see him; he went to Benoist's residence and was there about two hours. Benoist then told him he wished his will re-made, and gave him a list of the charities described in the will and the amount he wished to bequeath to each of them. Benoist asked the witness to add these bequests to see whether they amounted to more than the mortgages he then owned. Witness did as he was requested, and told him that the total was greater. "Well," he said, "We will have to cut this down." I think he said take a thousand dollars from each one, and the witness did so from all except one bequest of $2,000. Mr. Campbell said that he then went to his office and drew a rough sketch of the will in accordance with his instructions and went back the next morning and read it to him, and Mr. Benoist objected at once to the fact that I had omitted all this history about the Christian Brothers and those other matters that are in the will now, and then he gave the witness an old will from which he wished witness to copy the matters omitted; that then he went back to his office and wrote the will over again, finished it with the exception of the amount for the Italian school and also the residuary clause left blank for those two items. He then took it back to him and read it over clause by clause and sometimes he would

have him read it over and at other times he was sat-
isfied with the first reading.  Mr. Benoist then told him
to put in $8,000 for the Italian school.  Then he asked
him about the residuary clause, and after he gave him
instructions on this subject, Campbell says he wrote
it down on a separate piece of paper before putting
it into the will and read it over to Mr. Benoist; that
Benoist said, "This won't do; I want these Christian
Brothers tied up so they cannot spend any of this
money outside of Kansas City; that is my intention,
has been my intention all the time, that this money
which I have accumulated shall be spent, all of it, in
Kansas City." Thereupon Campbell went back to the
desk and wrote it over again so that it satisfied him,
and then he wrote it into the will.  Benoist then said
to him, "I want you to get someone to witness this
will." Campbell went back the next morning with
Browne.  Thereupon the contestees propounded the
following question to Campbell:  Q. "Now, Mr. Camp-
bell, state to the jury not only that morning but the two
or three days that you were at work on this, what would
you say was the condition of Mr. Benoist's mind as
to his capacity to make a will, whether he was of sound
mind or not?" A.  "Well, I don't think there is a man
in Kansas City, or in the State of Missouri, that is more
capable of making a will than Major Benoist was at
that time; that is my opinion."

At the time he executed this will, there was no one
in the room except the testator Benoist, Mr. Browne
and the witness Mr. Campbell.  Campbell testified that
he had been an attorney for Mr. Benoist for about
twenty years; he, Campbell, was not a Catholic, and had
no affiliations whatever with the Catholic church.  On
cross-examination he stated that he had heard Mr. Ben-
oist denounce preachers and lawyers, he put them to-
gether.  In the early part of May, 1899, Campbell drew
a will for the testator; he prepared the will for him
and took it over to Benoist's house and left it there

Archambault v. Blanchard.

with him.  Campbell did not sign the will as a witness.
In the early part of July, Mr. Benoist got the witness
to have the will typewritten, and witness got Mr. Parry
to put it in typewriting.  In the latter part of July,
Tom Hogan, an old soldier, came over to the office of
Campbell and reported that Mr. Benoist wanted him
to come over there.  And he went right over.  When
he reached there, Mr. Benoist told him that he had
concluded to have that will changed.  He got the will
and then got his little memorandum book and then went
back and sat down in his chair and said to Mr. Camp-
bell: "I want you to get a piece of paper and take
down what I read to you," and then he read off the
names of these various associations and the amounts
that he wanted to give them, and said: "Now you
know the amount of the notes and mortgages I have,
I want these donations to cover about the amount of
these notes and mortgages, figure that up and see
whether it covers that."  And three times previous
to that he had had Mr. Campbell make a list of these
notes and mortgages and they amounted to between
seventy and seventy-five thousand dollars according
to Campbell's calculation.  Campbell added up the
various bequests and told Mr. Benoist that he had made
the donations too large, that they were greater than
the amount of the notes and mortgages; thereupon Mr.
Benoist said, "Well, we will get them down propor-
tionately."  Campbell then made a deduction of about
twenty per cent on each until he came to a small dona-
tion to the hospital on Penn street, when he suggested
to Mr. Benoist that it was not worth while to cut that,
and Benoist agreed.  When he had finished this, Mr.
Benoist said, "Now see how that makes it," and Camp-
bell told him that this would be covered by the mort-
gages and that there would be some over, and Benoist
said, "Well, leave it at that," and Campbell then asked
him what about the balance of his estate, and Benoist
said, "Well, I want it to go to the Christian Brothers."

Campbell then took these memoranda and returned to his office and drew up the will. Campbell stated that he did not know any of the various institutions named in the will, he had heard of some of them, and some he had never heard of. On his own account he went to the court house to find whether the institutions were incorporated or not and found that one of them was not, the Jewish institution. The only thing he remembered Benoist saying about sectarian denominations was that he wanted to make the donations to all the various denominations. In regard to Mr. Benoist's health at that time, he stated that in his opinion it was about the same as it had been for six months before. Mr. Benoist went around more or less and came to his office often, he began to complain of his health, though the witness did not think there was much justification for his complaint. Witness learned from various others that the old man had got to drinking, but he never saw him drunk. Once when he was in his room doing some writing for him, he got up twice and went around a little corner there where Mastin, the negro servant, told witness Mr. Benoist kept a jug. Witness thought that he went around to get a drink, but did not know it, did not see the jug. Witness thought that on an average he visited Mr. Benoist at least once a week. He always went in the forenoon; as a reason for this he said, "I went over there twice or three times in the afternoon when he would send for me, and would find him in a kind of stupor; I did not know what was the matter with him, he wanted to sleep apparently, he was leaning back in his chair and dozing apparently, and did not want to be talked to; he would not do any business when he was in that condition." He remembered on two or three occasions that he went there and stayed for a half hour to find out what Mr. Benoist wanted, and did not find out and went away. He was not confused at all, his talk was plain enough when he would awaken and say anything, but he simply would not talk

to the witness, he would simply say that he did not want to be bothered, and witness inferred from what Mastin and Major Darnall told him, that Mr. Benoist was under the influence of liquor, though witness did not smell any liquor on him. Witness found him in this condition two or three times in the afternoon. It was in the latter part of his career that witness found him in this condition. When witness drew this last will, the old gentleman said to him, "Now, I will have to get you to get somebody to witness this will. I have been in the habit of going to Schuler to have him witness my wills, but I am not able to go around the streets." Witness was not certain but what he told him the doctor told him not to go around the streets. This was in the morning of the day that he took the will over there. Witness never went over in the afternoon to transact business with Mr. Benoist after he had seen him once or twice in that stupid condition, and after he heard the stories about his drinking. The old gentleman said he thought he was going to die. Witness was paid for writing this will fifty dollars by a check. Witness did not take Mr. Browne over to attest the will in the afternoon because he did not want any question about Mr. Benoist being in the condition to make the will, that is the reason he took Mr. Browne in the forenoon. Hogan was not in the room when the will was executed. The will was executed in the morning between eight and nine o'clock. Mr. Benoist was never profane and vulgar in the presence of the witness. He had heard him drive Albert Mastin out of his presence; on one occasion Albert came up and asked him for a quarter and Mr. Benoist told him, "Get out of this, you black hound," some such language as that, he called him a lazy hound, or something of that kind.

After this evidence in chief, over the objections of the plaintiffs, the court admitted the will in evidence.

On the part of the plaintiffs, Nora Stanley testified

that she was a waitress in Kent's restaurant; she came to Kansas City nine or ten years before the trial of this cause and had worked for Mr. Gaskill, who keeps a restaurant, during the last seven or eight years. She knew Joseph Benoist. He boarded at Gaskill's when she first went to work there about eight years ago; she worked there almost a year before she waited on him, but she saw him every morning. The waiters were both girls and boys, he liked the boys better and the boys usually waited on him. She began to wait on him a couple of years before she went away; she went away and stayed a year, and then came back. The last time she served Mr. Benoist was the first year of the Exposition at Omaha. He was nice and gentlemanly and was neat and becoming in his dress, he was very quiet and did not talk loud, he had one seat about midway in the dining room. During the first year that she knew him she never saw him under the influence of liquor, but later she did, after she had been waiting on him a while she noticed a change, then he got to be dull and sleepy, you would have to wake him up when you brought him anything to eat. He was that way morning, noon and night; if there was a cat or dog near he would get hold of it and would have them fighting, fed them right out of his plate; he would be kind to the cat or dog one minute and then in a minute he would have them hollowing, pull their ears, tails or anything he could get hold of to make a noise. He was odd, that is all I could say; he never did take much to me; I never heard him talk bad, he never used obscene or profane language to me. It must have been two or three years before he died when she saw him. I have heard him say he did not like women, used to say they were no good, that is all I ever heard him say, he never objected to me waiting on him. He used to be sleepy most every morning, muttered to himself

and would go to sleep and they would have to wake him up.

Ruth Hudson testified that she was a waitress at Gaskill's restaurant; she knew Joseph Benoist in his lifetime; when she first went to work at the restaurant, a boy named Fairbanks waited on Mr. Benoist. She began to work there in March, 1898, and quit the last of February, 1899. Benoist quit boarding there in December, 1898; before he left he became boisterous to the girls and to Mrs. Gaskill; he used to punish the cats and dogs that would come in. Mrs. Gaskill had some relatives that visited her, and he sat at the table with his back to them and he would turn around and make faces at them; he used to make faces at Mrs. Gaskill and the girls; at first he treated her like any other customer, but towards the last he jumped up and grabbed hold of her and pinched her, and Mrs. Gaskill made him sit down and behave himself; after that witness stayed on the opposite side of the table. He would grab hold of you any place. He did Mrs. Fox the same way. One day he poured his victuals on the table and took a spoon and spread them all over the table. Mr. Gaskill requested him to leave on account of the way he conducted himself. People refused to eat at the same table with him; he would swear and use obscene language; once when he was swearing, witness asked him where he expected to go when he died, and he said he would be buried and the bugs would eat him up, but that they would not do it if he could help it; he said that was all the place there was to go to. On cross-examination she stated she began to wait on him in October, 1898; during the time she was there from October to December, he grabbed hold of her a couple of times. I cried; I had not been in the business very long and was not used to the rough side of it. I cried on account of the offense, not on account of the pain; he did not hurt me. I never saw him grab hold of any one else except Mrs. Fox once.

Mrs. Sadie Fox testified she worked as a waitress in Gaskill's restaurant for three years and eight months and quit there in March, 1901. Joseph Benoist was boarding there in 1897, when she began to work; she was not there for breakfast; when she first went to work Mr. Benoist looked clean and neat and behaved properly, but towards the last there was a change and he was mean about people waiting on him, and when she went towards him he would try to grab her; on one occasion he grabbed her, and she had given him no occasion to do it; when she pushed him away and asked him what he meant, he laughed in a silly laugh, and said, "That will be alright." She testified also to his pouring the food on the table. She smelled liquor on his breath at the time he grabbed her, she threatened him with her husband and after that he let her alone. James Fox, the husband of Mrs. Sadie Fox, testified that he was the cook at Gaskill's; that when he first noticed Mr. Benoist at the restaurant he was quiet, low-spoken and very reserved; he was a very nice old gentleman except he did not care about ladies waiting on him; he would want four or five chips of butter on a large dish and wanted the waiter to put salt on it. Witness did not notice any change in his manners until his wife spoke to him about it. The old gentleman would call a dog, hold out a piece of meat and then grab the dog and make him hollow.

W. C. Gaskill, the proprietor of the restaurant, remembered that the deceased at first dressed in good laboring clothes and was clean in appearance and of good manners; he boarded with witness for several years; towards the last deceased was drunk a great part of the time; when he was in that condition he was abusive to everybody around him, he would grin and make faces at people; his conduct was silly. About a year or a year and a half before he left, he showed a weakness and got worse; he attributed a part of the conduct of the deceased to heavy drink. Mrs. Gaskill's

testimony corroborated her husband and the waitresses as to the deportment of the deceased when he first began to board with them and then as to the change in his conduct. He tortured the cats and dogs so that they would hollow; he became so bad that Mr. Gaskill asked him to stay away; she tolerated his conduct because she had respected him so much before. He quit boarding at their house in December, 1898.

S. H. Pierce testified that in the spring of 1897, he considered the deceased a very careful and accurate business man. Deceased got him to go to Baxter Springs with him to do some work on a vault. He wanted eighteen inches taken off of the top of the lot; in place of the dirt, he wanted twelve inches of cinders put back, and covered with gravel and cement. The lot was twenty feet square. Deceased gave him a plan for a grave and witness made it, finished the sides with granitoid. This was in August, 1898. We went back in November or December, 1898. Mr. Benoist gave him directions about his grave. He spoke about going to deceased's house, on one occasion when deceased drove him off; when witness saw him the next morning, the deceased said he ought to come when he sent for him, spoke as though the witness had not been there at all. Witness also detailed the trip to Baxter Springs. The old gentleman made him get out of the buggy and then drove off and came back and asked what he was doing there, and said, "Get in here; if old Bettie can't haul us we will get another horse." Made no reference to making witness get out of the buggy. Mr. Benoist had been a careful and accurate man until up to the time he was hit with a cable car; after that he was not. After that year he did not know that there was anything different, only he seemed to be glum, did not seem to be as sharp. Witness further stated, "I did not claim that I had any business with him where I I did not know that he was straight or all right; I do not mean to say that he was not a good business man

at any time; I never said I thought he was weak minded or anything; I thought he was different in the last of his transactions from the first.''

Mr. Barker testified he rented a house from Mr. Benoist, paid him rent in person until January, 1899, when he agreed to pay Darnall. The witness was a carpenter. In September, 1898, Mr. Benoist said to him, ''I have got my vault made now and I want you to make a coffin for me,'' and he gave him the dimensions from a little book he took out of his pocket. Witness finished the coffin in October, 1898; when the coffin was finished the old man laid down in it and said it was pretty large. He thought the old man was weak physically and mentally. In February, 1898, witness heard that Mr. Benoist was hurt by being hit by a cable car; from what he saw of him in the latter months of his life and from what he heard from him and the conversations he had with him, it was his opinion that from the time he was hit with the cable car he never was in his right mind afterwards. Witness further stated: ''He had his vault and I cannot see any inconsistency in his having his coffin made. I do not consider he was insane, but his mind was not as sound as it had been.'' Witness stated that he never did feel that his mind was really right after he was struck by the cable car. He made weekly settlements with him about the work he was doing for him between December, 1898, and March 11, 1899, and ''when I quit, I made a final settlement going back to December 19. I received a check from Mr. Benoist May 27, 1898. I did not hesitate about taking this check. I do not believe I ever saw him in the afternoon after he was hit by the cable car'' that he was not under the influence of liquor. ''I generally saw him in the evening after I quit work at six o'clock.''

Mrs. Boulware was a tenant of Mr. Benoist; her husband was a railroad employee; she made the contract of rental herself. The deceased was a careful

man, required references and acted like he did not care whether he rented the house or not; he was neat and clean in his clothes; at the first she got along pleasantly with the deceased; she lived very near to him; she noticed a change in him after December, 1898; he got so he would curse, and whip Albert the negro man. When she first knew him she never saw him undressed; in the latter part of his life, she saw him in his underclothes; on several times he would run after Albert without having his clothes on. On one occasion she paid him the rent about nine o'clock in the morning; in writing the receipt he got the date wrong; this was three or four months before he died. She complained so he let her pay the agent, Mr. Darnall. Before his queer spells came on him, he was always careful of his dress; he began to treat Albert badly the last few months of his life; she saw him strike Albert and kick him. A family named Peck rented a part of the house from witness, he was a nice man, he provided well for his family. Deceased did not know Mr. Peck; one day he came through the hall, asked for Mrs. Boulware, pushed Mr. Boulware aside and came into the kitchen, he did not want anything very particular, this was a month or so before his death; one day he came to her and told her to come and help him put Peck out, said Peck would not provide for his family. He met Peck in the hall and cursed him and Peck was about to strike him when witness interfered, told him that there was something the matter with the old man, she told Mr. Benoist he was sick and she took him home, he was very feeble. A number of Catholic sisters were at the deceased's house often. He said the priest was trying to get money out of him, but he did not want to give it to them, and that the sisters would not get any more than he chose to give them. She saw deceased about eleven o'clock the day he died, she saw Mrs. Tiernan leave the house about eleven o'clock, she came back, she was the first to go there after his death except her

folks.  She saw a sister at the house of the deceased.
About the time he died she thought his mind unsound.
His spells began with the cable car accident; before
that he had drunken spells pretty often.  Deceased
would come to her back fence frequently and talk with
her; he never came when he was intoxicated.  Albert
brought him home in the evenings in the summer before
he died; he did not go to town much after he was hurt
by the car.  Albert left the employment of the deceased,
but they sent and got him back a day or so before he
died.  The deceased liked Mrs. Nelson, in his latter
days if you humored or petted him he would just drop,
he liked us to be kind to him.  She saw him take three
glasses of clear whiskey; after taking it he was better
than before.

'Mr. Darnall testified he moved to Baxter Springs
in 1873, met the deceased Joseph Benoist in Septem-
ber of that year.  He was running a large supply store
there; witness went to work for him in the hardware
department.  Deceased was an active, exact and careful
business man.  Witness worked for him three years
and left there in June, 1877.  Mrs. Blanchard, her hus-
band and one daughter lived with deceased at Baxter;
Blanchard was a fine mechanic; his wife kept house for
the deceased.  Deceased was very clean and neat in his
habits and dress, dressed neatly but plainly.  The
Blanchards lived at Baxter Springs until Mr. Blanch-
ard died; they lived with the deceased six or seven
years.  The general health of the deceased was good;
he had an occasional attack of apoplexy or something
like that.  He had a fall one day at Baxter Springs
and was insensible.  He was able to be around the
next day and took an active part in the business.  He
kept whiskey and drank pretty often.  He never saw
him intoxicated until after he came to Kansas City.
While he was at Baxter Springs he made a loan to
the Christian Brothers of St. Louis of $40,000, at six
per cent interest.  Witness met Thomas Hogan at Bax-

ter Springs; he heard Mr. Benoist say he was going to provide for Hogan. Deceased was building houses in Kansas City in 1883, when witness moved there. The relations between the deceased and the witness were very close. There was no time after witness came to Kansas City that he did not have something to do for deceased. In the fall of 1898, he noticed a change in deceased. When he had the cable car accident, witness heard of it and went over to see him, and they met often after that. Noticed that he was breaking down. Witness looked after his houses before and after his injury; he received the injury about the 20th of February, 1899. He became insensible on Thursday and remained practically in that condition until Saturday; there was a contusion as large as a partridge egg near the temple; he would lay on his back and mutter "Cornish," and "Shut off" and "Cut off." After recovering consciousness he told witness that the property where he lived and the two brick houses in front should belong to Mary McGowan. She and her people had been living there ten or twelve years; her family treated him with the utmost kindness. Mrs. McGowan assisted him about his business matters, took care of him and cooked for him. From that time on witness went to his house almost every day until he died. If he did not get there by eight or nine o'clock, he would send Albert for him. After his accident his health was poor, he said his mind was all gone, and said, "I am crazy; lots of people have told you I am crazy, but now I know it myself." He told witness to take charge of his business, that he could not look after it any longer. Witness saw the deceased before noon; at noon and after noon did not notice any distinction in his appearance; in the morning and afternoon he was very sluggish. When two brothers came to get money for Joseph Blanchard he told them Joseph would never get a d—— cent of it, that if they ever got it in their

hands Joseph would never get it. Hogan and Albert nursed him. He struck Albert with a buggy spoke.

Nelson, another tenant of the deceased, testified that he was a laundryman. Deceased looked to be rather an intelligent old man, and carried on a conversation in good language, wore plain clothes and did not put on much style. From Christmas, 1898, he did not pay much attention to his dress and was not as neat as he had been, his conversation was not so intelligent, he seemed a little bit incoherent at times. After he was hurt in the spring of 1899, he seemed to be in a worse physical condition than before. He asked witness why he did not go to the Philippine war, and witness said that if he was a single man he would go, and the old man laughed, and said, "You ought to go and get your d— head shot off." He thought it was funny. On July 9, 1899, witness took his rent to the old man about 9 or 10 o'clock in the morning, and he seemed to be in a stupid like condition; he looked for the receipt and could not find any; then he made out a receipt, but it was not any more of a receipt than anything else. Witness told him to try again, witness then told him what to put down, the name and the amount and sign his name to it and he finally got it finished; this is the receipt: "July 9, 1899, Received of —————————— twenty-five dollars rent for number 608 Penn street, for one month ending July 30th, $25.00. Joseph Benoist." "The first time I noticed any change in Mr. Benoist was about January 1, 1899, in the way he talked about the Philippine war, it was the way he said it, there was nothing else excepting that." Witness detailed a conversation he had with deceased about repairing a water meter. Witness threatened to move out of the house if he had to pay the bill, and the old man said he did not want him to do that; that I had been there three years, and he loved me, my wife and my dog. Witness requested him to paper a room and he said he would consider it. Wit-

ness did not think he would remember it, but in about a week he did come and paper the room and he put on such a figure that I repapered it at my own expense. The paper was so peculiar that I would not have it. Witness regarded the selection of this paper as an evidence of an unsound mind. The witness paid him the rent on the 6th or 7th of August; the receipt was already written out. It was in the old gentleman's handwriting and was made out correctly.

Mrs. Nelson testified that Mr. Benoist abused Albert. She saw him three or four times in a partially dressed condition out in his flower garden.

Thomas Hogan testified that he was seventy-four or seventy-five years old, lived at the Soldiers Home at Leavenworth, Kansas; he served under Sherman in the United States army; he went to work for Mr. Benoist in 1868 at Baxter Springs, on his farm; did general work for him. Mr. Benoist had a half sister there named Melvina Blanchard. Witness stayed with him until he sold out in 1879. After a year or two witness came from Oswego, Kansas, to live with Mr. Benoist in Kansas City; worked on his farm at Westport. In 1882 witness went to work for a Mr. Levy, in 1886 he went to the Soldiers Home at Leavenworth, in 1893 and 1894 Mr. Benoist was all right, "I saw no change in him." Witness used to see the deceased about twice every six months. Witness went to Ireland in February, 1899, he had not seen Mr. Benoist between twelve and eighteen months before that and then he was all right and seemed able-bodied; in February, 1899, Mr. Benoist was a total wreck, he was a very decrepit old man. Witness told him he was going to Ireland, and if witness had not bought his passage he would have stayed and taken care of him. His voice was broken and very low; "he talked sensible enough, only he said it was a foolish trip for me to go." Witness remained in Ireland four months. The old man wrote him that he was very sick. Witness came back to

America, arrived in Kansas City on the 20th of June, next morning he went to see Mr. Benoist about nine o'clock, and was with him about twenty minutes. He introduced witness to Judge Campbell, and said that the Judge had come over to alter his will. Witness told him he would call again, and left him and the Judge together. Witness did call on him the next morning, and remained in Kansas City looking after him from June 20th to August 4th, and witness took down sick again and had to go to his boarding house; the next thing he heard was, Mr. Benoist was dead and buried. On June 21st, Mr. Benoist was very weak. His manner was pretty good, did not see anything wrong with his manners. On July 17th the witness at the request of Mrs. McGowan went to live with Mr. Benoist, and was with him continually from July 17th to August 4th, except when he would send him away; on one occasion he sent the witness for half a dozen pencils and when he brought them the old man broke them up. The negro Albert assisted the witness in nursing the old gentleman. He had Albert until one Saturday he got obstreperous and cursed Albert and drove him out of the house. "I think Albert told him to go to h— and this, that and the other." This conversation with Albert occurred one.or two days after the 17th of July; from that time his treatment of the witness was very loving, but when Albert was away his treatment of him changed very quick. One day he cursed witness and told him to get up and go away from there; he constantly abused the witness. From July 17th to August 4th, he had no control of his bowels. When witness left on the 4th of August, he left Albert still caring for the old man. From what he saw of Mr. Benoist from June 20th to August 4th, from what he saw him do, what he heard him say, and from the way he acted and from the condition of his bowels, it was his opinion that he was of unsound mind. From June to August people visited Mr. Benoist; there was Judge Campbell,

Mr. Darnall and one or two more, Mr. O'Flaherty and some Catholic sisters; he saw one priest come twice, but he did not go in; he knew Mrs. Tiernan, she was there frequently, she would sit by him and talk to him, saw her reading Mr. Benoist's will. The latter part of July or first of August, Mr. Benoist and the witness frequently discussed making wills; he said he had made so much money, $150,000, and he had paid other to the priest which he had turned out; he said he could not make a will; that he had to rely on Dan O'Flaherty, a civil engineer, to advise him to make his will. On cross-examination he stated that in the morning when the old man got up and dressed, he would sit at his desk and figure a little, write some, write some checks out; his mind seemed clouded an hour after he got up; his mind would not wander at all at that hour, but afterwards he seemed to like to talk about his burying ground, his money and his wills. His physicians were Dr. Griffith, one of the big doctors, and the other was Dr. Harrelson; he said he gave him medicine by prescription, and his wine which was watered by ladies; he took liquor himself, and witness used to fill the bottle once a day and sometimes twice; he took nearly a quart a day. He would not take his liquor until he was washed and clean, and what very little writing he did at his desk and then take the liquor after; he would take a small glass of liquor and some water; he might take it three times an hour, then begin at it again in the afternoon. About twelve o'clock he would sit there and you could not get a word out of him, you could not tell whether he was asleep or not. Witness was not there all the time, he would send him away with messages. Some days the old man would get jolly drunk, a good deal drunker than other days. The witness supposed the liquor had a great deal to do with his strange condition. Witness testified that in his deposition he said that Mr. Benoist took about three fingers or an ounce of liquor three times an hour; that he would begin

about eight o'clock and it would begin to have some effect about twelve o'clock; that he never went to bed on account of the liquor; that he was bright in the morning, but would get drunk towards evening and would not attend to any business when drunk and he testified, "I say so still, the old gentleman had sense enough in the morning to make out checks and sense enough to prevent any one watering his whiskey." I said I had an idea he was not altogether insane because he had sense enough to not let the lady water his whiskey. When witness went to see him on the 25th of February, 1899, he did not notice any change so far as his mind was concerned, but he spoke low and feebly.

The plaintiffs introduced the twelve wills already referred to in the statement.

Thomas Hogan was recalled for further cross-examination and identified a number of checks that were drawn by testator from June until August 4th.

Plaintiffs also offered in evidence Dr. B. D. Eastman as an expert on insanity and propounded to him a hypothetical question embodying the facts which plaintiffs claim had been established by the evidence, and by these facts inquired of him whether such a man at the time of signing said will was sane or insane, and he answered that he would consider him insane. This was the substance of the plaintiffs' evidence.

Proponents then called the following witnesses in rebuttal: ·

Dr. Griffith, who lives in Kansas City, and held at one time the rank of Major and Chief Surgeon in the army, who had known Mr. Benoist for a long time, and waited on him a number of times in July, 1899, and a day or two prior to his death, says: "I never saw a more sane man in my life."

Dr. Harrelson, who has practiced medicine in Kansas City since 1894, began to treat him the last of March or first of April, 1899, and treated him up to August 7th. He was called to relieve him of asthma; "recom-

mended him taking a normal amount of whiskey;" never saw him drunk; said that the condition of his mind was normal; received a letter from Mr. Benoist, dated August 7, 1899, and sent his account for services in response to it.

Dr. Block, practicing physician in Kansas City twenty-one years, had known Mr. Benoist for twenty years; waited on him in December, 1898, and January, 1899; he had bronchitis, with slight asthmatic complication; his mind was perfectly clear; "quite strong-minded, I should judge."

Dr. Logan, who had practiced in Kansas City since 1882, treated testator from January 4, 1899, to January 26, excepting Sundays; he came to his office; treating his throat; he had had the grip; was a very interesting talker; "it never struck me from anything he ever said that he was of unsound mind."

Harwood, a lawyer in Kansas City, was the attorney of Mrs. Tiernan after the death of her husband in 1897. Benoist was put in as a director in a printing company in which she was interested — was one until his death; he was the personal adviser of Mrs. Tiernan in her business affairs; saw him frequently in 1898. "Q. Was he, or was he not, a shrewd business man? A. Well, I thought he was about the shrewdest I ever saw." Saw him at different times in reference to Mrs. Tiernan's interest in this company in 1899 — in the spring and also in June or July; saw him twice in the spring, late in the afternoon when he was evidently under the influence of liquor suffering from grip. "Q. How was he when you saw him those times when you thought he was drinking; was he stupid and drowsy? A. No, I would not have called him either stupid or drowsy; but under ordinary circumstances he was an exceedingly alert man; was an extremely bright man, and any one who knew him well, had seen him handle business matters, would have seen some difference be-

tween him as he was when I saw him those two afternoons, and as he had been during six months previous."

Spottswood, lawyer, knew Mr. Benoist five or six years prior to his death; was at his home on business the middle of April, 1899. "I saw nothing to indicate that his mind was unsound. It seemed to me that his mind was perfectly clear." "He always seemed to me to be a man of strong mind and sound judgment."

Major Allen, one of the executors, testified that the estate was worth $127,000; saw Mr. Benoist only once in 1899; he was with Darnall; it was in April, May or June. I talked a few minutes with him. He seemed to be all right; he looked all right and talked all right. His speech was like it always had been, and he looked a little feeble, but his mind appeared to be perfectly clear.

Schueler knew Mr. Benoist for a long time and well; Benoist was at his office nearly every week; "he was a money loaner; and I attended to a great deal of his business in furnishing abstracts;" that he had been to his house when he was sick; the last time he saw him was about the middle of July, when he signed his will as a witness. "I knew about his getting hurt in February, but I didn't think much about it, he did not seem to think much about it himself. . . . I was transacting a good deal of business for him. I never had a sounder client mentally than Benoist was. I noticed no difference in him mentally after the cable accident. He was getting old; he frequently told me that the old machinery was wearing out; that he was going to die. . . . He never complained to me but once and that was about his throat, in December or January; I knew he drank, but I never saw him drunk or under the influence of liquor."

Stroeh, also an officer of the guarantee company, knew Benoist for a long time; did some business with him; saw him last in June or July when he witnessed a will; he appeared just the same to me as he always did.

From what I saw of him in the last two years of his life I considered him of sound mind.

O'Flaherty, civil engineer, lived in Kansas City, 44 years; knew Benoist "very well;" "I did all his work in my line; it brought me in contact with him a great deal." Benoist died on Friday; saw him the Sunday before; saw him three times in July; went there on business. In July he complained about his heart and side. "There was nothing that would relieve him but whiskey." Said he received a postal card from Benoist upon which was written: "June 29, 1899: My Friend — I think of dropping the park scheme and devising my means to charitable institutions. I want to consult and advise with you." Witness said he called and Benoist talked about charities. He says the last Sunday he was talking with him that "his mind was just as clear as it ever was." Saw him once in July when he was under the influence of liquor.

Brunner, twenty-five years in the hardware business in Kansas City; knew Mr. Benoist for about fifteen years; Benoist dealt with him. "During the year 1899 I never saw any difference in him except he got a little older. I think his mind was sound. He was a very particular trader and very prompt pay" — "a smart old business man." Saw him last the 14th or 16th of June, 1899.

Hucke, in hardware business in Kansas City since 1872; knew Mr. Benoist about fifteen years; "about a week before he came to my store and bought hardware. He had been in the habit of trading with me. He took out his hardware that day himself. He walked down. It was about three-quarters of a mile to the store from where he lived. I talked to him that day. His physical condition was not good. I did not find any difference in his mind. I saw him two or three times before that in 1899, at the store. I never found any difference in his mind from what it had been formerly."

Merrill, in lumber business in Kansas City since 1868; saw him often; Benoist did business with him; received a check from Mr. Benoist dated June 5, 1899, for lumber sold him; talked with him at Missouri ave- nue and Delaware street perhaps five minutes in May, 1899; it was raining. He said the reason he was out on such a day as that was that he was going to pay his taxes; says he was of sound mind always when he met him; that there was nothing peculiar about him.

Cross, plumber in Kansas City for about twenty- one years; knew Mr. Benoist for twenty-five years. Did business with him the last three years of his life; "met him every once in a while during the last year of his life. Saw him the last time the day before he died. He sent his man down to have me do some re- pairs on the plumbing. When I went to the house I met him on his front porch and he told me what he wanted done; the work was on the house where he was living; right under his front porch; he directed me what to do there; his directions were quite intelligible; he went back into the house and I did not see him any more. From what I saw of him during the last year of his life I regarded him of sound mind. I did not see any indications at any time, in any interview, dur- ing the last year of his life, of any failing in his mind."

Brougham, ex-county judge; knew Mr. Benoist in- timately for thirteen years; saw him often — the last time in May, 1899, in front of city hall. Said to him: "Well, a man a street car can't kill is pretty good tim- ber anyhow; and he said, 'Yes, it did me up for a while, but it could not down me completely.' " Met him three or four times that spring and talked with him. "I won- dered at the intellect of the old gentleman. He was as bright as a dollar;" saw no difference in him in so far as intellect was concerned.

Davis, a farmer, lived in Jackson county, Missouri, fifty-one years; knew Mr. Benoist two or three years;

198 Sup—27

borrowed $5,000 from him; went to see him about two or three weeks before he died; he was not drinking when he saw him; it was his opinion that Benoist's mind was sound.

Allen, real estate and loan agent; made loans for Mr. Benoist the last of July or first of August, 1899; called on him; talked about his loans; talked to him from one to one and one-half hours; "Why, he was just as bright then as I ever saw him in my life."

Mrs. Moore, connected with Old Colored Folks' Home; "I went there in April, 1899, and stayed until July;" Mr. Benoist came there while she was there and looked through the house; he said, "I want to see your institution; I am visiting the charitable institutions." He would not register his name; he said: "You will hear from me later."

Mrs. Frankel, a Jewish lady, who had lived in Kansas City fourteen years; knew Mr. Benoist from 1896 until his death; he was very much interested in charities generally; asked me to report about the various charities of Kansas City; saw him two days before his death; saw him three or four times in August. "His mind was clear. He was losing ground physically, but his mind semed to be clear to the last." "He was entirely sober and not stupid or drowsy."

Sister Renee, one of the Little Sisters of the Poor; went to his house every month; he gave them a dollar a month for five or six years; said he would leave them something; sometimes she thought him under the influence of liquor slightly, but "not to hurt his mind; he knew what he was talking about."

Mrs. Tiernan, after her husband's death, had Mr. Benoist made a director of a printing company in which she was interested; he looked after her affairs; he attended all the board meetings except the last one in May or June; she used to take him food the last five or six months of his life; he was in delicate health for the last year and ate very little; was not confined to his bed

except two days after he was knocked by the cars; saw him the day he died, and nearly every day during the five or six months previous to his death; never saw him take a drink of liquor, but used to smell it on his breath at times during the eight years she knew him; never saw him under the influence of liquor until the last year of his life and then never until evening; "his mind was as clear as a bell in the morning." Albert, the colored man, was drunk most of the time, but Mr. Benoist had had him so long that he thought he could not get along without him.

Dart, lived in Kansas City twenty-eight years; secretary of a printing company; knew Mr. Benoist from April, 1897, he then looked after Mrs. Tiernan's interests; was a member of the board; saw him within four or five hours before his death; he was a very good business man; "I did not notice any difference in his appearance except that he seemed weaker."

Leavens, paying teller of Midland National Bank; saw Mr. Benoist two or three times each month; mind was all right so far as we could see; made a social call on him the month before his death; he was quite sick. "He talked like a rational person who understood what he was talking about."

Webb, cashier Missouri Savings Bank, Kansas City, for fifteen years. Mr. Benoist did business with the bank for ten years, especially the last two years prior to his death; he came to the bank the last year in a carriage; seemed to be in feeble health; was not different in his business transactions from what he had been; saw him at the bank the last time a few months before his death; he did not seem-to be different, so far as his business capacity was concerned, from what he was before.

The foregoing is in substance all the testimony. At the close of all the evidence the court gave the following instructions on behalf of the proponents:

"1. The jury are instructed that there is no evi-

dence before them to show that any undue influence was exercised by anyone over the mind of the testator Joseph Benoist to induce him to make the will in question, and the jury in making up their verdict will confine themselves to the question whether at the time of making said will the said Benoist was of sound mind or not.

"2. Although the jury may believe from the evidence that for several months before his death the said Benoist was under the influence of intoxicating liquors a large part of the time and that he did in fact exhibit in his conduct all the various eccentricities and peculiarities shown in the evidence, yet these facts do not affect the validity of the will in question, provided you believe that at the time of its execution the said Benoist was of sound and disposing mind.

"3. The court instructs the jury that Joseph Benoist, in making his will, had the right to dispose of his property as he pleased, and to give all or so much thereof to whomsoever he pleased, and although the jury may believe from the evidence that he made such a distribution of his property as to cut off some of his legal heirs with nothing or but little, such facts raise no presumption of the invalidity of the will; provided the jury find that while making the will he had a sound and disposing mind and memory.

"4. The court instructs the jury that soundness of mind as used in these instructions, means no more than the ability to know and comprehend what one is doing, and the general character of one's property, and the persons who reasonably came within the range of his bounty; and therefore if the jury believe from the evidence that Joseph Benoist signed the paper read in evidence as his last will, and that at the time of so doing he had sufficient mind and memory to know that he was disposing of his property by will, to whom he was giving it, and who came reasonably within the range of his

bounty, and the general nature and character of his property, then he was of sound mind.

"5. The court instructs the jury that the testator, Joseph Benoist, if of sound mind, had the right to make a will and dispose of his property in any way he saw fit; and if you believe from the evidence that he was of sound mind and disposing memory, as the term is defined in other instructions, when he signed the writing presented to you, and two persons witnessed the same in his presence, and that he signed the same voluntarily as his free act, it is of no consequence whether you consider it a wise and sensible will or not, and you should find the issues submitted to you in favor of the will.

"6. The court instructs the jury that, if they believe from the evidence that at the time of the execution of said will, Joseph Benoist had such a mind and memory as presented to him all his property and all the persons who came reasonably within the range of his bounty, and if he had sufficient understanding and intelligence to understand his ordinary business and understand what disposition he was making of his property, he had sufficient capacity to make the will in controversy."

And refused the following instruction:

"The jury are instructed that there is no sufficient evidence before them to justify a finding that the testator, Joseph Benoist, was not of sound mind when he made the will in question, and the jury in arriving at their verdict will disregard all the testimony upon that branch of the case."

Which instruction the court refused; to which ruling and action of the court defendants then and there duly excepted at the time.

At the request of plaintiffs, the court gave the following instructions:

"1. The court instructs the jury that while it is the law that one of sound mind may dispose of his prop-

erty by will, yet it is also the law that before a will can be held valid it must be proven that at the time it was executed the person making the will was of sound mind. Sound mind as here used means such a mind as enables a person executing a will to be capable of knowing his property and understanding the reasonable claims of the persons who may have reasonable and natural claims on his bounty. Therefore in this case unless the evidence reasonably satisfies the jury that Joseph Benoist at the time he executed the paper writing in controversy, possessed a sound mind, then such paper writing is not the will of said Joseph Benoist and your verdict must be for the plaintiffs.

"2. The jury are instructed that the burden of the proof is upon the defendant to show by a preponderance of the evidence that at the time of the execution of the paper writing, offered as the will of Joseph Benoist, he was of sound mind as defined in the other instructions; and preponderance of the evidence as here used, means the greater weight of the credible testimony; and if from a consideration of all the evidence the jury are not so satisfied then they will find a verdict for the plaintiffs.

"7. It is not sufficient in order to make a valid will that the testator be of memory when he makes the will, to merely answer familiar and simple questions, but he must have a disposing memory, so that he is able to make a disposition of his estate with understanding and reason; and if from the evidence you fail to find that, at the time of the execution of the paper propounded by the defendants, Joseph Benoist was able to make a disposition of his estate with understanding and reason, then you will find for the plaintiffs and so say in your verdict.

"8. Notwithstanding the jury may believe from the evidence that Joseph Benoist was able to transact some business, giving checks, receipts, etc., and yet unless the jury believe and find from the evidence, that at

the time of the execution of the instrument of writing, propounded as the will of Jospeh Benoist, he possessed a mind and memory sufficiently clear and unimpaired to take into consideration all his property,. and the persons who had a natural and reasonable claim on his bounty, if any, and the disposition he desired to make of the several kinds of his property, then he did not have sufficient capacity to make a will, and the verdict must be for the plaintiffs.

"9.  You are instructed that you cannot consider the paper purporting to be the autobiography of Joseph Benoist, and purporting to have been made by him in January, 1898, as proving, or tending to prove, the truth of anything therein stated, and you cannot find from such paper that any statements therein made are true, and you can only consider such paper for the purpose of determining the state of mind of Joseph Benoist at the time he made it and the disposition which he intended to make of his property at the time he wrote said paper, and for no other purpose."

Under the instructions of the court the jury found that the paper writing propounded as the will of Joseph Benoist, was not his will.  In due time the defendants filed their motion for new trial and a motion in arrest, which were heard and overruled, to which the defendants duly excepted, and thereupon, judgment having been entered upon a verdict, the defendants appealed to this court.

I.  The circuit court instructed the jury that there was no evidence of any undue influence having been exercised over the testator to procure the execution of his will, and from that ruling the plaintiffs did not appeal. Hence the only question for our determination at this time is whether there was any substantial evidence that Mr. Benoist had not sufficient mental capacity to make the will now in dispute. In the first place, the testimony of Gaskill, the owner of the restaurant, at which the

testator took his meals for some months prior to December, 1898, and of his wife and the various waitresses who served in said restaurant, may be stricken out of the case, because the contestants' own witnesses, Mr. Pierce and Mr. Barker, business men, who had business relations with Mr. Benoist up to and during the spring and early summer of 1899, established beyond the peradventure of a doubt that up to February, 1899, the testator was a careful, accurate business man, and had ample testamentary capacity, to say nothing of the overwhelming testimony, on the part of the contestees, from such witnesses as Mr. Campbell, the lawyer who prepared the will in question, and of Dr. Griffith and Dr. Harrelson and Dr. Block and Dr. Logan, all eminent physicians who had resided in Kansas City and had known Mr. Benoist for twenty years before his death and had attended on him in a professional capacity, and Mr. Harwood, the attorney for Mrs. Tiernan, in whose printing company Benoist was a director up to the time of his death, and of Mr. Schueler, the proprietor of a large abstract business in Kansas City, through whom Mr. Benoist was accustomed to loan his money, and of the various merchants, lumber men and the bank officers of several banks in Kansas City, with whom Mr. Benoist was accustomed to do business, all of whom testified that he was not only a man of good business qualifications down to his death, but that he was an exceedingly bright, shrewd and capable business man, even after he had begun in the last months of his life to fail physically. Considering then the evidence of Pierce, Barker and Mrs. Boulware, one of his tenants, and the old soldier, Thomas Hogan, as to his condition after the street car accident, about the 20th of February, 1899, previous to his death on the 12th of August, 1899, we find their evidence to establish certain eccentricities and peculiarities; among others, that he was inclined to be agnostic in his religious opinions; that he was addicted to drinking intoxicating liquors

and would get under their influence to such an extent that in the afternoon he would be incapable of transacting business, and would refuse to do any business in the afternoon; that he would on various occasions scold and drive away the negro man who served about his premises, the evidence showing that the negro himself was often drunk; that his general physical health declined and his memory failed and he would be given to fits of temper that witnesses had not observed in former years. There was evidence also that in the year before his death he had erected a monument on his lot in the cemetery in Baxter Springs and had his grave dug and lined with granitoid, and said that when he was dead he wanted his body cemented in this grave; that he also had the carpenter make his coffin and directed there should be no nickel-plated handles put on it. It is to be noted in this connection that a number of the witnesses who testified to those peculiarities on the part of the testator, continued to transact business with the old gentleman and had no hesitancy whatever in accepting his checks in payment for their services, and that his tenants who rented his buildings from him continued to pay him rent and take his receipts therefor up to and within a few days of his death. All these eccentricities and peculiarities in connection with the evidence as to his indulgence in intoxicating liquors to an excess in the last days of his life, was submitted to an expert witness and he testified upon that hypothetical question that he would say that the testator was insane at the time of the execution of the will in contest.

An action to contest a will under our system of laws is one at law and it has on numerous occasions been adjudged that this court will not weigh conflicting evidence to determine whether the jury found against the weight of the evidence. [Young v. Ridenbaugh, 67 Mo. 574; Sayre v. Trustees of Princeton University, 192 Mo. l. c. 120.] But it has often been held by this court

that it will examine the record of the evidence in a will case to see if there is any substantial evidence to support the verdict. [McFadin v. Catron, 138 Mo. 227; Hamon v. Hamon, 180 Mo. 685; State ex rel v. Guinotte, 156 Mo. 520; Crossan v. Crossan, 169 Mo. 631.] In determining whether a testator had sufficient capacity to make a will, this court has kept in view the standard of mental capacity required to sustain a will, and again and again it has been ruled that the testator must have had sufficient understanding to comprehend the nature of the transaction that he was engaged in and the nature and extent of his property and the persons to whom he desired to give it without the aid of other persons. [Brinkman v. Rueggesick, 71 Mo. 553; Couch v. Gentry, 113 Mo. 248.]

With these fundamental principles established, we come to examine the character of the evidence adduced by the contestants to show the incapacity of Joseph Benoist when he made the will in contest. At the outset all suggestions of undue influence, fraud or imposition are to be excluded from our consideration, as the circuit court found there was no evidence upon which to base such an allegation, and the question of mental capacity alone is before us. As already said, the whole evidence of both sides established beyond a peradventure of a doubt that up to February 20, 1899, Mr. Benoist was a most careful and successful business man, and had accumulated a large estate amounting to something like one hundred and fifty thousand dollars by his own energy and investments, so that our inquiry need not go back of the 20th of February, 1899, to inquire as to his mental capacity on the first day of August, 1899, when he executed the will. Without recapitulating the evidence on behalf of the contestants, which we have been compelled to set out in substance on account of the nature of the issue before us, we are of the opinion that none of the eccentricities testified to by the witnesses for the plaintiffs, nor the testimony showing that the old

gentleman was in the habit of becoming intoxicated in the afternoon of the last month or so of his life, when taken in connection with the testimony of some of the witnesses as to his business capacity and business habits during that time, would justify any court in holding that he had not the possession of his mental powers at the time he executed his will. It would serve no good purpose to reproduce at length the utterances of this court in so many recent cases as to the insufficiency of such evidence to destroy a man's will. It will suffice to refer to a few of those cases which are accessible to all. [Story v. Story, 188 Mo. 110; Catholic University v. O'Brien, 181 Mo. 68; Hamon v. Hamon, 180 Mo. 685; Crowson v. Crowson, 172 Mo. 691; Wood v. Carpenter, 166 Mo. 465; Kischman v. Scott, 166 Mo. 214; Riggin v. Westminster College, 160 Mo. 570; Martin v. Bowdern, 158 Mo. 379; Fulbright v. Perry County, 145 Mo. 432; Von De Veld v. Judy, 143 Mo. 348; Jackson v. Hardin, 83 Mo. 175; Riley v. Sherwood, 144 Mo. 354.]

As said by Judge Cooley in Frazier v. Jennison, 42 Mich. 206, and often approved by this court: "Nothing is more unquestionable than that, by the Statute of Wills it was intended that every man should be at liberty to select the objects of his bounty among his relatives at his discretion, or even to pass them all by if so disposed." To hold in the face of all the evidence on both sides in this case, that Joseph Benoist was incapable of making his will, would be a practical nullification of the Statute of Wills. As was said in Wood v. Carpenter, 166 Mo. l. c. 487, "No one who reads that will could believe for a moment that the one who dictated it was incapable of making a will," and so we think of this will in the light of the careful dictation of its contents to the attorney who prepared it. And we can only attribute the verdict of the jury to a disposition to set aside the wills of other men because the testator makes a different disposition from what the jurors would have made had they been making the will.

When this will is read in the light of the circumstances surrounding Joseph Benoist when he executed it, and in the light of the various other wills which he had previously executed, we find nothing unreasonable or unnatural in the disposition of his property. His wife and children were all dead; the relatives in whose favor he had made his first wills, had either all died, or, as he expressed it, the reason for providing for those still living had in his opinion ceased to exist; it was entirely proper for him to divide his estate among the various charity institutions of the State in which he lived and in the city in which he had spent the last twenty years of his life. As to the suggestions of his being intoxicated in the afternoon in the last month or two of his life, it must be borne in mind that these same witnesses testified to his mind being clear in the morning and the uncontradicted evidence is that he gave the directions for the draft of his will in the morning of one day and when the draft was brought to him the next or succeeding day, he insisted on incorporating in the will a history of his benefaction to the Christian Brothers College in St. Louis, and required his attorney to redraw the will; that when this was done, it was again submitted to him in the morning and having met his approval, he directed Judge Campbell to get another subscribing witness to attest the will, and that he finally executed this will before or about nine o'clock in the forenoon of August 1, 1899. The only witnesses present when the will was finally executed were Judge Campbell and Mr. Browne, another member of the bar, and Judge Campbell testified that on that occasion he did not think there was a man in Kansas City or in the State of Missouri more capable of making a will than was Joseph Benoist at that time. No witnesses were called who testified to a different mental condition at that time, nor was there a scintilla of evidence tending to impeach the testimony of the two subscribing witnesses or their character as truthful, credible men. As

Archambault v. Blanchard.

strong as the indisposition of this court has always been to interfere with the verdict of a jury on a question of fact, it has always been the law that the verdict of a jury cannot be allowed to stand when there is no substantial testimony justifying it.

In our opinion, giving full faith and credence to all the testimony offered on behalf of the contestants in connection with the overwhelming testimony of the physicians who treated Mr. Benoist up to the very last days of his life, and of the attorneys who transacted business with him in important business relations and of the various tradesmen with whom he dealt and of the bank officials with whom he did business, we are forced to the conclusion that the jury should have been directed to return a verdict that the paper writing propounded as the last will and testament of Joseph Benoist and executed on the first day of August, 1899, was his last will and testament, and for refusing to so direct, the judgment of the circuit court of Jackson county must be and is reversed with directions to that court to enter up its judgment that the paper writing aforesaid admitted to probate by the probate court of Jackson county is the last will and testament of said Joseph Benoist.

*Burgess, P. J.,* and *Fox, J.,* concur.