NANCY STORY et al. v. HENDERSON STORY et al.,
Appellants.

### Division One, March 30, 1905.

1. **WILL: Omission of Heirs: Contest: Traversable Issue.** The omission from the will of the names of those heirs who are the natural objects of the testator's bounty is no ground, standing alone, for setting the will aside, and is not a material, traversable issue in a will contest. Full provision for protecting the rights of a pretermitted heir is made by statute, by appropriate remedy, without striking down the will except *pro tanto*.

2. ————: **Fraud: Pleading.** Facts constituting the fraud must be pleaded. And where the pleader identifies the fraud by a specification he is held to the precise specification pleaded.

3. ————: **Incapacity: Divorced Wife.** The decree of divorce against the wife, rendered on personal service, settles once for all that her husband performed the obligations of his marital contract. And where her testimony as to his capacity to make a will relates to his conduct towards her prior to the separation, that testimony is weakened by the adjudication in the divorce proceeding.

4. ————: ————: **Calling Children as Dogs: Pulling Hair: Giving Credit.** The summoning of his grandchild as he called a dog, the pulling of his own hair and of his wife's hair, the giving of notice as surety to the payee to sue on a note and afterwards loaning the debtor money with which to pay the note, are not sufficient evidence to set aside, on the ground of the testator's incapacity, the will of a person guilty of such things.

5. ————: ————: **Condition of Contestants.** In determining the mental capacity of the testator to make a will the court cannot be influenced by the poverty of the contestants or by the fact that their attorney has a conditional fee in the result of the litigation.

6. ————: ————: **Instructions.** Whether the instructions given in a will contest were correct or erroneous, the court will not permit to stand a judgment setting aside the will on the ground that testator was incapacitated to make a will, if that finding and judgment are wholly unsupported by substantial evidence.

Appeal from Stoddard Circuit Court.—*Hon. J. L. Fort,*
Judge.

REVERSED AND REMANDED (*with directions*).

*Mozley & Wammack* for appellants.

(1) The verdict was for the wrong party if the law is to be upheld that a man has the right to dispose of his property by will, unless it clearly appears by a preponderance of the testimony that he was incompetent at the time he made the will to execute a valid instrument.   Sehr v. Lindemann, 153 Mo. 292.   (2) The time to which the question of testamentary capacity relates is the precise time of the excution of the will.   A will executed while the testator is of sound mind is not affected by his subsequent insanity.   25 Am. and Eng. Ency. Law, 974    (3) It may be stated as a general rule as to the mental capacity to make a will, "that a person who at the time of making his will has an understanding of the nature of the business in which he is engaged, a recollection of the property he means to dispose of, of the persons who have a claim upon his bounty, and the manner in which it is to be distributed, has sufficient mental capacity to execute a will."   25 Am. and Eng. Ency. Law (1 Ed.), 970; Underhill, Law of Wills, p. 111; Maddox v. Maddox, 114 Mo. 42; Brinkman v. Rueggesick, 71 Mo. 556; Norton v. Paxton, 110 Mo. 465; Von De Veld v. Judy, 143 Mo. 367; McFadin v. Catron, 138 Mo. 213; Carl v. Gobel, 120 Mo. 283. Unless there is substantial evidence of the incapacity of the testator, it is error for the court to refuse to instruct the jury to find in favor of the will.   McFadin v. Catron, 120 Mo. 252, 138 Mo. 213; Jackson v. Hardin, 83 Mo. 175; Maddox v. Maddox, 114 Mo. 35; Cash v. Lust, 142 Mo. 630.

*Andrew W. Hunt* and *K. C. Spence* for respondents.

(1) The tract of land sought to be devised by the pretended will was a homestead; the will was attempted to be executed July 23, 1888, at a time when

testator had a wife whom he was not divorced until
September 13, 1890; and, therefore, as a conveyance of
title to that land, the will is a mere nullity. R. S. 1899,
sec. 3616; Rockhey v. Rockhey, 97 Mo. 76; Kaes v.
Gross, 92 Mo. 647. (2) Notwithstanding some con-
structions apparently to the contrary, it still appears
that, in will contests, ''the verdict of the jury, or the
finding and judgment of the court, shall be final. . . .''
R. S. 1899, sec. 4623.

LAMM, J.—The issue was *devisavit vel non?* The
trial was by the court without a jury, the judgment was
for contestants, and from that judgment Henderson
Story, the principal legatee and only defendant an-
swering, appeals.

In the latter part of the year 1899, Lemuel Story
perished in an unexplained fire that consumed his
dwelling in Stoddard county. He was then an old man
of nearly four score, living somewhat of a hermit's life
on a small and poor farm of eighty acres, and possessed
of an estate valued at $2,500. His mind confessedly for
five or six years before his death was unsound at in-
tervals, which condition became more accentuated to-
wards the close of his days, yet he managed his own
small affairs, bought, sold, traded, hired hands and
looked after himself practically until his death. He
could neither read, write nor cipher, and the vicissitudes
of his married life had been none the less dramatic be-
cause of his humble station; for he gave hostages to
fortune by three marriages, had issue by each and, be-
times, was sorely pinched by the shoe of matrimonial
infelicity.

Henderson Story, proponent of the will, was a
child of the first marriage; the record is silent as to
the relationship of some of the other parties, but it
may be stated generally they were children of one or
the other marriage or the descendants of those dead.
The contestants are children of the last marriage, ex-

cept Elizabeth Henderson, and her relationship is not located by the pleadings or proof.

Rachel Story was the third wife of testator and the maternal ancestor of contestants. Testator, on personal service, procured a divorce from her in the circuit court of Stoddard county on September 13, 1890, for abandonment—the decree finding and adjudging that they were married in Tennessee on August 6, 1854; that he faithfully demeaned himself as her husband; that they lived together as man and wife until the said Rachel without reasonable cause abandoned him on March 7, 1886. The evidence showed that the contestants took sides with their mother in the estrangement, and those of them at home at the time left with the mother.

In July, 1888, as shown by the undisputed evidence, after the separation and before the divorce, Lemuel Story appeared in Bloomfield at the office of his attorney, Major Bedford, an aged lawyer of fifty years' practice, and dictated to him his will, procured the same to be written and witnessed, and carried it away and deposited it for safe-keeping with his son, Henderson, in whose custody it remained until his death over eleven years afterward, when it was produced by Henderson to the probate court of Stoddard county and admitted to probate in common form on January 2, 1900.

The will is as follows:

"I, Lemuel Story, of the county of Stoddard, in the State of Missouri, being of sound mind and good memory, and feeling the weight of age weighing upon me, knowing the uncertainty of life and the certainty of death, and being desirous to make a final disposition of what property I may have at my death, hereby make and declare this to be my last will and testament; as follows, to-wit:

"First, after my death, it is my will that all my just debts and funeral expenses be paid; secondly, I

will and bequeath all my property both real, personal and mixed to my beloved son, Henderson Story, except as hereinafter stated; the real estate hereby bequeathed being the east half of the northeast quarter of section number thirty-five; the south part of the southeast quarter of the southwest quarter; the southwest part of the northwest quarter of the southeast quarter, and the northwest part of the southwest quarter of the southeast quarter of section twenty-six, all in township twenty-seven north, of range number ten east, one hundred and twenty acres more or less.

"Thirdly, I give and bequeath my son, Hutson Story, one dollar to be paid to him by my executor, hereinafter named.

"Fourthly, to my son, Jefferson B. Story, one dollar to be paid by my executor.

"Fifthly, to my daughter, Naomi Walker, one dollar to be paid to her by my executor.

"Sixthly, to my daughter, Colfumy Jones, one dollar to be given to her by my executor.

"Seventhly, to my daughter, Nancy Story, one dollar to be paid to her by my executor.

"Eighthly, and I hereby will and bequeath to my daughter, Elizabeth Walker, one dollar to be paid to her by my executor.

"It is my will and desire that my executor, hereinafter named, pay these several sums to my said children as herein above stated out of any means he may have of my estate.

"Ninthly, I hereby make, constitute and appoint my said son, Henderson Story, my executor to execute this my last will and testament.

"In testimony whereof, I have hereunto signed my name in the presence of the undersigned witnesses, who have subscribed their names as witnesses to this instrument at the request of the said testator, and in his presence.                                    mark
"LEMUEL X STORY.

"Attested by
    "H. H. BEDFORD and
    J. K. CUNNINGHAM."

To the March term, 1901, of the Stoddard Circuit Court, contestants brought this suit, their grounds for breaking the will being set forth thus: "That said supposed will is not the last will and testament of Lemuel Story deceased, because, first, it is not dated; because, second, it is not witnessed; because, third, it omits several of the heirs at law of said deceased; because, fourth, it is not sufficient in forms, [sic]; because, fifth, it is not formally executed, because at the time of its attempted execution, which is believed to be about the year 1902 [sic], said deceased had not mental capacity sufficient to execute a will; and because, sixth, the execution of said supposed will was procured by the undue influence of Henderson Story upon the mind of said deceased; and because, seventh, the execution of said supposed will was procured by the fraud of Henderson Story, in that he made false impressions upon the mind of said deceased, with the intent and effect of causing him to hate all the others of his said children and grandchildren, who were his heirs at law, and entitled to his bounty."

Henderson Story's answer is a general denial. Respondents prayed no instructions. Appellant asked and was given the following instructions:

"The court declares the law to be that there is no evidence in the cause as to undue influence upon the part of Henderson Story upon the mind of the testator; therefore as to that issue the judgment of the court must be to sustain the will.

"The court declares the law to be that in this case the court finds from the evidence, that the paper read in evidence, as the last will and testament of Lemuel Story, deceased, was executed on the 23d day of July, 1888, and regularly and duly attested by the testator and the subscribing witnesses thereto, and that the bur-

den of showing that the testator was not of sound mind at the date of the execution of said instrument, or that undue influence was used upon the testator by Henderson Story to induce him to make said will, at the date thereof, rests upon the plaintiffs in this action, and unless the court finds from the evidence in this case, that the testator was of unsound mind at said date, or that undue influence was used upon him, the judgment of the court will be for defendants, sustaining the will.''

Appellant asked and was refused the following instructions, saving his exceptions:

''The court declares the law to be that, under the evidence in this cause, the finding of the court will be that the will is valid.

''The court declares the law to be that there is no evidence in this case of the unsoundness of testator's mind, or mental incapacity of the testator to make a will at the time of the execution of the will; therefore, as to that issue, the verdict of the court must be that the paper read in evidence is the will of the deceased, Lemuel Story.''

It appears that Henderson Story lived about two miles from his father and had always been on friendly terms with him, that at the time of the execution of the will he was worth two thousand dollars, and at the time of his father's death he had laid by for a rainy day so much as $6,000. The contestants were shown to be at all times in lowly circumstances. Other pertinent facts bearing on the issues will appear in the course of the opinion.

It will be seen that the court below, as a matter of law, held that under the proofs the issue of undue influence as well as the issues tendered relating to the proper execution and attestation of the will on July 23, 1888, must be found for the proponent. That is to say, the proponent not only made out a prima facie case entitling the will to probate in solemn form, but went fur-

ther and got a ruling in his favor on the issue of undue influence, thus leaving contestants to stand or fall on (1) the issue that heirs were omitted from the will (2) the issue of lack of testamentary capacity, and (3) the issue of fraud, which fraud is described and given earmarks by the pleader as follows: "in that he," Henderson Story, "made false impressions upon the mind of said deceased, with the intent and effect of causing him to hate all the others of his said children and grandchildren who were his heirs at law and entitled to his bounty."

I.  Two considerations dispose of the question of pretermitted heirs.  In the first place there is no evidence sustaining the allegations.  The testimony being as follows from appellant, Henderson Story (placed on the stand by respondents).

"Q.  Are you acquainted with all the heirs, and were you acquainted with all the grandchildren of your father at the time he made this will; do you know their names?  A.  I don't know; I have not heard of some of them; there were two brothers, I have not heard from them in twenty years.

"Q.  Are they your own brothers?  A.  No, sir, just half-brothers.

"Q.  Outside of those, who were not residents of the State, are you acquainted with his children and grandchildren at the time of his death in Missouri?  A. Yes, sir.

"Q.  Is it not a fact that in the making of this will, that he failed to mention the name of a number of them?  A.  I don't know of any he failed to mention; I don't know myself.

"Q.  Was not the Messer family, children and grandchildren?  A.  They were grandchildren.

"Q.  He did not mention them did he in the will? A.  I think not; he mentioned the mother.

"Q.  Was she then living?  A.  I think she was."

It will be seen that the scant and colorless testimony above had no probative force, because the presumption of death at the end of seven years, so far as concerns the two unnamed half-brothers, is not assailed, let alone overthrown; because, further, as to the Messer family, while the name "Messer" does not appear in the will, nor any other name *idem sonans,* yet the muddy and unsifted testimony indicated that the mother of the Messer children was alive at the execution of the will and is mentioned therein—*how,* is left to conjecture. This explanation, vague as it is and itself crying explanation, seems to have satisfied respondents, and as they allowed the whole matter to sleep in the obscurity of insoluble mystery we feel no call to disturb its slumber.

In the second place, our statutes make full provision for protecting the rights of a pretermitted heir, as to such heir the testator dies intestate. [Sec. 4611, R. S. 1899.] His rights may be given him by partition, ejectment, distribution or other appropriate remedy without striking the will down except *pro tanto.*

We do not hold that the omission from a will of the names of those heirs who are the natural objects of a testator's bounty, may not be shown on an issue of testamentary incapacity, or lack of disposing memory, or undue influence, or fraud. All we hold is that such fact, standing alone, is not ground for setting a will aside and is not a material, traversable issue in this case.

II. As to the issue of fraud: The better doctrine now is that the facts constituting the fraud must be pleaded in an action at law or equity, whether the fraud be alleged in the answer or petition, care being taken to avoid pleading mere evidential facts on one hand and mere conclusions on the other. [Nagel v. Railroad, 167 Mo. l. c. 96, and cases cited.]

It is also fundamental that if the pleader identifies

the fraud by a specification he is held to the precise specification pleaded. Viewing the allegation of fraud in the petition, together with the specification, as vague to the verge of uncertainty and indefiniteness, and, in the absence of demurrer or motion to make more specific, allowing the defect cured by the grace of the Statute of Jeofail, after verdict, yet examination shows the record barren of any testimony tending to show that Story was guilty of any word or of any deed calculated to make "false impressions upon the mind of said deceased, with the intent and effect of causing him to hate all the others of his said children and grandchildren who were his heirs at law, and entitled to his bounty," as averred in the petition. To the contrary, in the light of the testimony, Henderson stands with clean hands, four-square to every wind of legal criticism that can legitimately blow and altogether *rectus in curia*. So that the will cannot be upset on account of fraud in its genesis.

III. The pertinent testimony introduced by contestants to sustain the charge of testamentary incapacity is as follows:

Frank Skelton worked for testator about 1893, five years after the will was executed, and testified thus:

"Q.  I will get you to state if you know anything about his mental condition at that time?

"Mr. Mozley:  We object, if the court pleases, because it is after the execution of this will.

"The Court:  I will hear his testimony.

"Mr. Mozley:  We except.

"Q.  I will get you to state to the court, if you know anything about his mental condition at that time; did you ever see him do anything to indicate he was not of right mind; that he did not have a sound mind? A.  When I was at work for him I could not tell there was anything wrong with him, only he was old and childish.

"The Court: All I desire to know is whether or not he was competent to make this will, when he did make it.

"Q. After you left there, I will ask you if you knew of him doing anything to lead you to believe he was not of sound mind? A. Yes, sir, after I left there about seven years, he had spells; he would talk out of his head foolishly.

"Q. Tell the court what he would do? A. He would see people, men sometimes and women sometimes; he said they would come there to bother him; he came over to my house once and wanted me to go over there with him; he said there was an old woman there and that he could not get her away, and so I went over there and there was no one there."

The divorced wife was placed on the stand and told the following story relating to a condition of things preceding the separation in 1886.

"Q. Do you think he was of sound mind? A. No, sir.

"Q. What did he do to make you think he was not of sound mind? A. He would rear around and pull his hair; so I do not know what to call it; I never gave him fault to rear on me, or anyone else; I was always—

"Q. You say he would make the folks get up at midnight? A. Yes, sir.

"Q. Who was at home at that time? A. Me and the two youngest children.

"Q. How old were they? A. About seventeen and twenty.

"Q. Now, did you have a clock at that time? A. Yes, sir; when he would get up at midnight he would look at the clock.

"Q. Did he say what time it was? A. I never heard him say.

"Q. You say he would keep you up until daylight? A. Yes, sir.

"Q. How often would he do that? A. About every month.

"Q. Now at that time, was there anything done to cause him to do that way? A. No, sir.

"Q. Did he assign any reason for his so doing? A. No, sir.

"Q. Was there anything else to lead you to believe he was not of sound mind? A. He was always 'rearing' and 'ripping' around; I don't know what was the cause of it.

"Q. When did you first begin to notice the fact that he was off mentally? How long before? A. About four or five years; I can't hardly state now.

"Q. I will get you to state if he gradually grew worse? A. Yes, sir.

"Q. To refresh your memory, *did he ever tell any stories and repeat them over?* A. Yes, sir, he would tell them over time and time again.

"Q. Would he do that when eating a meal's victuals? A. Yes, sir.

"Q. Were you back at his house, after you separated from him? A. No, sir."

Nancy Story, contestant, told the following story:

"Q. Do you know anything about the mental condition of Mr. Story before your mother and he separated? . . . A. No answer.

"Q. What did your father do to lead you to believe he was not of sound mind? A. He would get mad and pull his hair; get us up at midnight, and he would wake mother up pulling her hair, at any time of the night; he would wake up mother pulling her hair, and he would pull her hair and his hair.

"Q. When he would get the family up, what would he do? A. He would set and quarrel and rear.

"Q. Did the family quarrel at him? A. No, sir.

"Q. How long before was it, that you first began to notice those traits of character? A. About twenty years.

"Q. About twenty years ago? A. Yes, sir.

"Q. In 1888, he had been having those spells for four or five years?

"The Court: That is a matter of calculation.

"Q. Did he gradually grow worse? A. Yes, sir, I thought so."

Naomi Walker, another contestant, testified as follows:

"Q. I will get you to state to the court, if you know anything about the mental condition of Lemuel Story before he and your mother separated? A. I left there before they were separated, but I was there off and on.

"Q. Have you been there since they separated? A. Yes, sir.

"Q. Have you been—have you ever been on unfriendly terms with Lemuel Story? A. No, sir; always friendly with me.

"Q. State, if you know anthing about his mind being affected? A. When I went back, there seemed to be a little something wrong; he would talk, and he seemed like he was bothered.

"Q. When you left there, was he talkative? A. He was not a great man to talk.

"Q. When you came back to visit him, tell the court what his actions would be? A. They looked curious; he would tell anything; he would start along to tell anything—maybe he would start to tell something and tell something else, then he would come back to the same subject and tell it over. I do not know what was the cause of it."

Elizabeth Hill, contestant, testified as follows:

"Q. What was the mental condition of your father; was he of sound mind? A. He didn't act like it.

"Q. Tell the court how he acted? A. He would get mad and rear around, and always have us up at

midnight, and keep us up all night, and quarrel and 'strut' around.

"Q. When he had you up, did he give you any cause why he did it? A. No, sir.

"Q. Did you children quarrel with him? A. No, sir.

"Q. Tell the court why you didn't? A. I.was like all the other children, I was afraid to.

"Q. Was he a large man? A. No, sir, he wasn't a large man.

"Q. What other acts did he do to lead you to believe he was not of sound mind? A. Before I left there he would get mad and pull his hair out, and have us up.

"Q. How often did you see him do that? A. I never saw him pull his hair out but a few times; he had us up a number of times.

"Q. When he pulled his hair, was it prior to the separation of your mother and father? A. Yes, sir.

"Q. How long before was it? A. About two years ago, as well as I remember.

"Q. About two years ago? A. Yes, sir.

"Q. Did you ever see him awake your mother by having her by the hair of the head? A. Yes, sir.

"Q. How often? A. I do not remember.

"Q. You don't remember? A. No, sir."

G. W. Patterson lived with, and worked for, testator in 1895, as a hired hand and testified thus:

"Q. Did you ever work for him? A. Yes, sir.

"Q. How long ago has it been? A. I guess about five years ago.

"Q. About 1895? A. Yes, sir, I think about five years ago.

"Q. Five years from now? A. Yes, sir.

"Q. I will get you to state to the court what you know of Lemuel Story's mental condition, if anything? A. Yes, sir, I know a little.

"Q. I will get you to state to the court what you know of him being of sound mind or otherwise? A.

Part of the time he seemed like he was of sound mind and part of the time he seemed like he wasn't.

"Q. Tell the court what he would do? A. Well, the first time I ever noticed he was off, I was there one evening, the first time I was ever there; he thought he seen somebody, and I didn't know but what he had. I went over there to see about getting some work; he said he saw somebody up stairs, trying to carry off all he had.

"Q. Did you go up stairs to see whether or not it was true? A. No, sir.

"Q. After that time, did you ever see him do or say anything that led you to believe he was not of sound mind? A. Yes, sir, some few things.

"Q. Tell the court what they were? A. One morning, the next time, he seemed a little out of the way, he began to think his horse was in somebody else's horse lot.

"Q. Did you ever hear him call his grandchild like a dog? A. Yes, sir.

"Q. Tell the court how he would call the child? A. He would call the child Jim; he would call him like a dog; he would say, 'here Jim, here Jim.'

"Q. Where was he looking for the child? A. He was out of doors north of the house.

"Q. Calling the child like a dog? A. Yes, sir."

George Bryant testified that testator was his surety on a small note payable to one Pruitt. Bryant being about to go to Dunklin county to pick cotton in 1888, testator notified Pruitt to sue and when Pruitt sued, testator loaned Bryant money to pay the debt. Witness proceeded as follows, giving no dates, but on cross-examination locating the events as commencing about 1894 and thence on down:

"Q. After that time, after 1888, did you ever see him do anything else to lead you to believe he was out of mind? A. From that time on, I would notice; that caused me to notice more than I would; why, he would

be talking about a certain thing, and maybe before he would get through, it appeared like it would go off of his mind and he would talk about something else. He went ahead and transacted his business; I had dealings with him; I made trades with him after that.

"Q. Did you ever see him upon any occasion with his pants on wrong side before? A. No, sir; I have seen him what I pronounced mighty near perfectly crazy; somebody had to be there with him pretty near all the time; I was there one time when Frank Story and his wife and Henderson was there, in the morning, and went after the doctor that day; he wanted to come home, it appeared like he thought he was in Scott county, and wanted to go back home; he took a whole lot of harness and things and stacked them upon the gate, and was going to take them home with him, but I don't know what was the matter with him.

"Q. Did you ever have any conversation with him yourself? A. Yes, sir.

"Q. Did he make any complaint of his children being mean to him, or anything like that? A. No, sir, I don't think that he did; it seemed like he charged the whole family, the old lady and the girls, with being the cause of their separation.

"Q. Now, while he was laboring under those mental aberrations, would he talk about them then? A. No, sir, unless somebody would speak something about it."

C. H. Haines testified:

"Q. (By Mr. Spence.) How long did you know Lemuel Story before he died? A. I have known him for about ten years.

"Q. Did you ever live close to him? A. Yes, sir.

"Q. How long ago has that been? A. It was in 1897, I believe.

"Q. Did you see him do anything, or say anything, to lead you to believe he was not of sound mind? A.

I went down there one morning and he was bare-headed, he had his pants off, he put them on wrong side before; seemed like he could not get them on right; I went to put them on for him.''

On cross-examination the witness said:

''Q. (By Mr. Mozley.) This occurred in 1897, when he had his pants on before? A. Yes, sir.

''Q. He had been sick at that time? A. Yes, sir, I think so.

''Q. At that time he was transacting his own business and running the farm? A. Yes, sir, my boy was working for him at that time.''

In the examination of Wright Harper the following occurred:

''Q. I will get you to state to the court if you know anything about the old man Story's mental condition before he died? A. He was not in his right mind all the time before he died.

''Q. How long before he died, about six years? A. Yes, sir, but not all the time.

''Q. Do you know whether he was in his right mind in 1888? A. No, sir, I do not know anything about that.''

The foregoing is the whole case of respondent on the issue of testamentary capacity, and we have given it *in extenso* so it may speak for itself.

It will not be necessary to give here the countervailing testimony of appellant; suffice it to say, that by a number of disinterested, close neighbors of long standing and unimpeached integrity, it was shown that in 1888 testator was of sound mind and memory and that he transacted his ordinary business matters until his death with sense and discretion, but that for four, five or six years before he died he became somewhat erratic at times and had ''spells.''

The question at issue was the testamentary capacity of Lemuel Story *on July* 23, 1888. The court allowed wide range in the testimony, to-wit, a period of

fifteen years—from two years before the separation of testator from Rachel, his wife, down to the day of his death.

In his excellent work (1 Underhill on Wills, sec. 104), Mr. Underhill says: "No rule of competency can be stated, except the rather vague one that evidence of mental condition prior or subsequent to the making of the will must be sufficiently near in point of time to aid in determining the testator's condition at the time of making the will; and whether or not it is too remote is a question for the court to decide. But after this evidence is admitted its weight is always for the jury."

Some of respondents' testimony was too remote for any value. The evidence of Rachel Story, antedating the separation, is weakened by the adjudication of divorce. In that suit testator tendered her two issues, at least, (1) his good conduct and (2) her bad conduct. The challenge then made was not accepted and the decree rendered on personal service, settled once for all, as to her, that Lemuel had performed the obligations of his marriage contract *in toto,* and that she was the party in default.

Giving to respondents' proof on this issue its full value and allowance to the trial court, who saw and heard the witnesses, that deference in weighing oral testimony permitted by the law, yet a critical reading of the schedule of facts on which the judgment is based, shows how far short respondents stopped of making a case of testamentary incapacity under the later decisions of this court and the present marked trend of the judicial mind. These decisions come within the purview of Lord Coke's maxim, *judicia posteriora sunt in lege fortiora,* and they are so lucid, so apposite and so rich in learning on this question, that it seems labor lost to do more than merely refer to them without undertaking to restate the principles of law involved. [Sehr v. Lindemann, 153 Mo. 276; Norton v. Paxton, 110 Mo. 456; McFadin v. Catron, 138 Mo. 197; Cash v.

Lust, 142 Mo. 630; Schierbaum v. Schemme, 157 Mo. 1; Wood v. Carpenter, 166 Mo. 465; Hughes, Admr., v. Rader, 183 Mo. 630; Studybaker v. Cofield, 159 Mo. 596.]

It would be a startling infringement on the innocent gaiety of mankind to determine judicially that raconteurs (of any degree) must repeat their favorite stories only under the impending danger of being finally adjudged not only guilty of intellectual staleness but of actual imbecility and consequent testamentary incapacity; or that an anxious grandfather may not call his truant grandson with an inflection of voice and a cadence of tone known to him to be effectual in producing the presence of the family watch dog, without thereby furnishing legal evidence of mental aberration. And it would seem both novel and dangerous to announce from the bench the doctrine that, under no less a penalty than that of losing the right to dispose of one's property, one may not tear his own or another's hair, or give notice as a surety to a payee to sue and afterwards have one's bowels of compassion moved into loaning the principal debtor money enough to prevent a distraint and sale on *fi. fa.;* or if years after a testator had made his will, he inadvertantly put on his pantaloons "hindside before," or the ills of life and the weight of fourscore years cause him to lose his mental reckoning at intervals or become at times distraught, the matter should be adjudged to tread back and by a sort of *nunc pro tunc* process overturn his testamentary disposition of property. In fine, this court seems committed to the proposition that where there is a will there is not always a way—to break it.

In the consideration of this case, we trust we have given proper weight to the *argumentum ad hominem* addressed to us *ore tenus,* and outside the record, by the earnest and eloquent counsellor appearing for respondents, to the effect (1) that it was his first case in this court, that (2) he had a contingent fee of respect-

able size in the final result (and needed the fee), and (3) that his clients, the daughters of testator, were goaded by penury and like misfortune into earning a scant and hard living by manual labor in the fields of Stoddard county, and, hence, he was anxious to win his case.

Avowing a natural sympathy for the persuasive conditions indicated above, yet it would seem that we are wisely precluded from giving any consideration to aught but the law of a case and to the application of that law to the cold record facts. Hence we must gently but firmly decline to follow the attractive lead suggested by respondents' counsel.

The instructions prayed by appellant should have been given. But instructions or no instructions, the finding and judgment are unsupported by any substantial evidence.

Accordingly the cause is reversed and remanded with directions to the court below to admit the will of Lemuel Story to solemn probate and to adjudge its validity. All concur, except *Brace, P. J.,* absent.