SAM N. HALL and WILLIAM M. HALL, Appellants, v. MERCANTILE TRUST COMPANY ET AL.—59 S. W. (2d) 664.

Division One, April 20, 1933.

*Gossett, Ellis, Dietrich & Tyler* for appellants.

*Daniel C. Ketchum* for Trustees of and for Interdenominational Home for Girls; *John T. Harding* for Third Church of Christ, Scientist; *Fred J. Wolfson* for Mrs. Louis Meyer and Mrs. Aletha Lane; *Stubenrauch & Hartz* for Mercantile Trust Company, Executor; *George Reinhardt* and *Henry L. Jost* for Research Hospital et al.

STURGIS, C.—This is a suit brought and tried in the Circuit Court of Jackson County contesting the will of Julia E. Hall, deceased, theretofore probated in Jackson County at Kansas City. The deceased, Julia E. Hall, died testate at the age of sixty-five years without descendants, never having been married. The plaintiffs are her two brothers, her heirs at law, who will take the property if the will be set aside. Testatrix also left surviving her her mother, who died some six months later and before this case was tried. It will not be necessary to set out the will of Julia E. Hall which is being contested further than to say that thereby she devised her property of the value of sixty to seventy-five thousand dollars to the defendant Mercantile Trust Company of Kansas City in trust for the benefit of her mother during her lifetime, and at her death, after paying some minor legacies which may be mentioned later, the remainder was divided equally between three named local charitable institutions, the Research Hospital, the Interdenominational Home for Girls, and the Third Church of Christ Scientist. The two brothers bringing this suit, one living in Kansas City and the other in Claremore, Oklahoma, were named in the will and given the sum of five dollars each. The defendant Mercantile Trust Company, a banking institution, was named as executor of the will, as well as trustee, and is given large and full power to manage and control the property, sell, invest and reinvest the same, pay taxes, repairs, and improvements on the same, etc. Other provisions and details of the will may be adverted to later. The defendants are the Trust Company as executor and trustee under the will and the three charities or their trustees, together with three women, Mrs. Aletha Lane, Mrs. Louis Meyer, and Mrs. LeClair Lambert, whom testatrix named in the will as friends of herself and her mother and whom she directed the executor to consult in providing for the support and comfort of her mother, who was then quite old and feeble.

The petition alleges that the paper writing which was admitted to probate as the last will and testament of Julia E. Hall is not her will and testament for the reason that "said Julia E. Hall was at the time of making said paper writing sick and of unsound mind and memory to such degree and so mentally infirm that she was incapable of making a will; that at said time she was so unbalanced and irrational and mentally incapacitated that she did not possess sufficient testamentary capacity to make a will," and for the further reason that at the time of executing such purported will said Julia E. Hall was subjected to the undue influence of the defendants and other persons unknown to plaintiffs, who "through cajolery, flattery,

and by encouraging the deceased into a false belief that she had a grievance or grudge against the plaintiffs, and by coercion and over-persuasion, and by playing upon the mental infirmity and irra-tionality of the deceased, did so unduly influence the deceased in and about the making of said paper writing'' that same is not the will of said Julia E. Hall. The answer denied these allegations and on such issues the case was tried to a jury.

After the evidence was all in the court sustained a demurrer to same on the issue of the will being procured by undue influence, but refused a demurrer on the issue of the testatrix being of unsound mind. The procedure was that defendants, as proponents of the will, made a prima facie case by showing the due and formal execu-tion of the will in question and that testatrix was of sound mind. The plaintiffs then produced their evidence tending to support, as they claim, both the issues as to undue influence and mental in-capacity. At the close of plaintiffs' evidence the court refused a demurrer to same on both issues and heard the evidence of defend-ants on such issues and of plaintiffs in rebuttal and then took from the jury by demurrer the issue of undue influence and (somewhat reluctantly) submitted the case to the jury on the ground of mental incapacity, including insane delusions, of testatrix by instructions re- . lating to that issue. After a lengthy trial the jury returned a ver-dict in favor of the plaintiffs, declaring that the writing in question was not the will of Julia E. Hall. Thereupon the defendants filed, and the court sustained a motion for new trial on the specific ground that it had erred in refusing to sustain demurrers to the evidence both at the close of plaintiffs' evidence and at the close of all the evidence. The plaintiffs have appealed to this court from the order granting the new trial and there is thus presented the question whether there is any substantial evidence warranting a finding that testatrix was at the time mentally incompetent to make a will. The defendants claim that other errors were committed relating to the admission and exclusion of evidence, and more particularly to the giving and refusing of instructions on the issue of mental incapacity, which justified the granting of the new trial, though not so specified in the order.

The evidence in the case took a wide range, much of it being of little, if any, value. The trial lasted some two weeks and the record here covers over fifteen hundred printed pages. Both sides perhaps tried the case on the theory that many a little makes a muckle. It will be impossible, if the opinion is restricted within reasonable limits, to more than in part summarize the evidence. We have, however, given the case much time and serious consideration. The jury found against the will on account of mental incapacity or insane de-lusions of testatrix, itself a serious matter, and it is equally serious

for a court to determine whether there is any substantial evidence to sustain such verdict.

There are certain outstanding facts which are uncontradicted or clearly established by the evidence. The testatrix was a teacher in the public schools and had been such for more than forty years, at first in the country schools and later and for many years in the schools of Kansas City. She had received promotions and increase of salary from time to time and at her death, at the age of sixty-five, was still teaching and was earning one hundred eighty dollars per month. She taught school on Friday preceding her death on Wednesday, and on Saturday night was stricken and found at her home Sunday morning unconscious and died the following Wednesday, October 13, 1926, at the Research Hospital. She had executed her will some six months previous. She had enjoyed good health with little exception, except that during the last three or four years of her life she was afflicted with anemia, which developed into pernicious anemia, but this had never interferred with her work or usual activities. It is unquestioned that she had been a woman of good mind, cultured, intellectual, of strong character, much energy, and good business ability. At the time of her death testatrix owned property of the value of some sixty to seventy-five thousand dollars, consisting of a house and lot at Fortieth and Baltimore Avenue in Kansas City, a farm of one hundred twenty acres in Kansas, some fifteen miles from Kansas City, and personal property consisting mostly of bonds and notes secured by real estate mortgages. She was reared on this Kansas farm, which had been owned by her mother, but farmed by her father, her parents continuing to live on the farm for several years after she began teaching school. Out of her own earnings she bought and paid for the Kansas City property at a time when it was suburban property and worth much less than it became worth later when the city grew and developed southward. This required, however, large and frequent expenditures not only for regular taxes, but for special taxes and assessments, for city improvements, and special benefits. She had sufficient business sagacity to hold this property till it grew in value. In 1895 testatrix's parents left the farm and came to live with testatrix at Kansas City at her home on the Kansas City lot. The father died in 1902 and the mother continued to live with testatrix and was so living with her at her death, the mother being then ninety-five years old. The farm had afforded only a small income and in 1909 the mother conveyed to testatrix a half interest in the farm for the expressed consideration of her having cared for and supported the mother, and in 1917 conveyed the other half to her for a like consideration. Her brothers knew of these conveyances and the purpose for which made and made no objection. Shortly before her death testatrix made a

written contract to sell this farm for ten thousand dollars. In addition to the above, testatrix had some money, bonds, and notes secured by real estate mortgages amounting in all to about fifteen thousand dollars. She had always looked after and managed her own property and business affairs. She kept an active banking account, depositing her money and issuing numerous checks. No one questioned her business ability in managing her property and investing her earnings unless it be that she contracted to sell the farm too cheap), though the looking after and renting of it was much trouble to her and the income was little, if any, more than the expenses.

In her early life testatrix became a customer of the defendant Mercantile Trust Company, depositing her money there and consulting the officers and employees of that bank, particularly Mr. Lambert, in her business affairs. While she exercised independent judgment and made investigations, her investments were generally at least made in securities handled and recommended by that bank. The relations between testatrix and this bank were normal in every way and such as exists in innumerable instances between banks and their customers. The bank merely rendered the advice and service common in such relations. It seems perfectly natural, therefore, that when testatrix came to making provisions for the future care of her aged mother, she should select the wife of Mr. Lambert, though not a relative, as one to be consulted in that regard.

When it came to making her last will, Julia E. Hall very naturally, we think, consulted with this Trust Company and her business friend, Mr. Lambert. Of her own volition and without suggestion from anyone, she went to the Trust Company, made known her intentions to make her last will, and asked if it would act as executor and trustee, and, on receiving an affirmative answer, asked if anyone there would write her will for her. Mr. Lambert informed her that the Trust Company could not do that, but that its attorney could do so and advised her to take time to write out in detail just what she wanted the will to contain, and then he would have the bank's attorney put it in legal form. This the testatrix did, after talking with her mother as she said, and in a few days returned with a memorandum written in her own handwriting and containing all the provisions put in the will. This memorandum was given to the bank's attorney, Mr. Stubenrauch, who, without ever knowing Julia E. Hall or talking to her, wrote the will in question from this memorandum. The will, after being thus prepared, together with her memorandum, was returned to testatrix, who fully examined it, and, expressing her satisfaction, signed it, and two bank clerks who knew her signed as witnesses in due form. All the evidence shows that the will was written out in full accord with the memorandum prepared by testatrix and contained all the provisions outlined by her and

none other. No one was consulted or had anything to do with testatrix's making this memorandum. She read over the will as drafted, said it was as she wanted it, signed and executed the same, and gave it to the bank for safe preservation. There is no evidence whatever that anyone interferred with, induced or influenced testatrix in making this will. All the persons directly connected with the preparation and execution of the will, and who knew her well in a business way, testified to the perfect soundness of her mind.

As to the three chief beneficiaries in the will other than the mother, the Interdenominational Home for Girls was a purely charitable organization, and there is no evidence that anyone, whether connected with or interested in such institution or not, ever knew of any bequest to that institution being in the will till after same was probated, and certainly no one influenced testatrix to make such bequest. The Research Hospital is a semi-charitable institution supported largely by gifts and doing much charitable work, but receiving pay for such patients as are able and willing to pay. The testatrix had at least once, though several years before her fatal illness, received some treatment at this hospital and knew of its work. Mr. Lambert was a trustee of this institution but profited in no way. He testified that he never solicited or suggested this bequest and knew nothing of it till he saw it in the memorandum which testatrix prepared as a guide in having the will drawn. As to the other beneficiary, the Third Church of Christ Scientist, Julia E. Hall was not a member of any Christian Science Church, though of late years she had attended that church and took some part in its activities. She had also made some study of its doctrines and teachings and doubtless believed in same to some extent, but never manifested any great devotion to or zeal in its behalf. There is nothing to show that such church, or anyone for it, used any influence, much less undue influence, in inducing this bequest. There is only one other bequest in the will calling for even passing comment, and that is "Out of the balance, if any, left on hand (after providing for the mother, etc.), my said friend, Mrs. Louis Meyer, in consideration of many acts of kindness shown to me in my lifetime, shall receive the sum of two thousand dollars." The evidence comports with the will as to Mrs. Meyer's long and intimate friendship to testatrix and her mother, and she testified that she never solicited or knew of this bequest being made till the will was probated. There was no evidence to the contrary.

█ After considering the very voluminous record, we fully agree with the trial judge that there is no substantial evidence in the record of any undue influence being used in connection with the making of this will. When we remember that undue influence such as will overthrow and make void a will must be such as does in fact sub-

vert and subordinate the free agency of the testator to the domination and control of another person, so that what is written therein is not the will and desire of the testator, but is the will and desire of such other person, the evidence here is far short of sustaining any such contention. [Turner v. Anderson, 236 Mo. 523, 540, 139 S. W. 180.]

We may here note that this testatrix made ample and generous provision for the support and care of her aged mother. The will directs the trustee to keep the funds of the estate invested in income producing property and use the net income for the support of the mother, "the intent being to provide her with all the comforts and conveniences of life so far as such income will permit," and "in thus caring for my said mother said trustee shall, however, not be confined to the income from said estate, but may, if necessary, in its opinion, apply a part of the capital from time to time towards said purpose." Said trustee was then directed in carrying out this provision to consult with three named women who were designated and shown to be friends of the mother and testatrix, one of them being a relative. The only objection to this will is that it gave the residue of the estate to charity instead of the brothers. In this connection it was shown that these two brothers had many years previous married and set up homes of their own, the one being a lawyer in Oklahoma, and the other a long time employee in the United States Post Office at Kansas City. One had property worth some fourteen thousand dollars, and the other property worth approximately twenty-five thousand dollars, and each was earning a respectable income. Whatever else may be said, each had for many years gone his own way and lived his own life, leaving this sister to look after the parents, the father having lived with her until his death, and the mother surviving her.

While there is much evidence bearing on the question of mental capacity of testatrix to make a will, yet after it is all considered there is little doubt that, when measured by the usual legal test applied in will cases, no mental unsoundness is shown. The legal test of such capacity, as stated in numerous cases, is that the testator be mentally capable of understanding the nature of the transaction he is engaged in, that is, disposing of his property to take effect at his death, the general nature and extent of his property, and to whom he desires to give it, and is giving it. This court said in Sayre v. Trustees of Princeton University, 192 Mo. 95, 120, 90 S. W. 787: "The standard of mental capacity required to sustain a will has been fixed so far as judicial utterances can settle a principle, and it is that the testator must have 'had sufficient understanding to comprehend the nature of the transaction that he was engaged in, the nature and extent of his property, and to whom

814

he desired to give it, and was giving it without the aid of any other . person.' '' This language is varied somewhat into saying that the testator must have capacity to understand the common and ordinary business transactions of life. [Berkemeier v. Reller, 317 Mo. 614, 644, 296 S. W. 739; Winn v. Grier, 217 Mo. 420, 452, 117 S. W. 48; Major v. Kidd, 261 Mo. 607, 629, 170 S. W. 879.] To this has been added the capacity not only to remember the names of the persons who were the natural objects of testator's bounty, but ''their deserts with reference to their conduct and treatment of him, their capacity and necessities.'' [Turner v. Anderson, 236 Mo. 523, 544, 139 S. W. 180.] ■ It could hardly have been intended, however, to permit a jury to set aside a will because, in its opinion, the testator did not properly appreciate and gauge the deserts, capacities and necessities of certain relatives within the range of the statutes of descent and distribution. See concurring opinion of Brown, J., in Major v. Kidd, 261 Mo. 607, 630, 170 S. W. 879.

■ Judged by this simple test, this testatrix clearly measured up to the testamentary capacity required to make a will. She clearly had mental capacity to understand the nature and effects of a will, knew that she was disposing of her property to take effect at her death, had a mental grasp of the general nature and value of her property, and knew to whom she wanted to give it, and was giving it. She evidently knew her brothers and mother bore that relation to her and named them as such in her will.

There is no doubt that testatrix, during the last few years of her life, was afflicted with anemia and her blood analysis made when she was taken to the hospital on her fatal illness showed pernicious anemia, but it had not reached a stage which would necessarily or even probably seriously affect her mind. The diagnosis then made was ''pneumonia complicated with pernicious anemia.'' The anemia tended to lower the vitality of all the organs of the body rather than to specially affect the brain. The superintendent of schools and leaders in the parent teachers' association, as well as patrons of the school, testified as to her efficiency and giving satisfaction in school work, and there was no such change in her physical appearance, her dress, or conduct in her school work as to cause adverse criticism or even comment from that source. Considerable is said about her not being the up-to-date dresser that she was in her younger days, but even plaintiffs' medical experts did not give much importance to this fact. We must hold, therefore, that when measured by the ordinary test of mental capacity sufficient to make a will, there is no substantial evidence to the contrary.

■ There is, however, another element entering into the question of mental capacity to make a will which is present in exceptional cases and must be dealt with here. Insane delusions constitute a

species of mental incapacity or unsoundness of mind in will contests. A person may possess sound mental faculties generally and yet be deranged or abnormal in some particular respect. One may be of sound mind generally and yet be possessed of an insane delusion on one subject or as to one fact. It is said in Sayre v. Trustees of Princeton University, 192 Mo. 95, 128, 90 S. W. 787: ''Medical men of great learning maintain that a mind diseased on one subject must be classed as unsound, but the law of this State is too well settled to be gainsaid that a man's mind may be impaired in one faculty and practically unimpaired in all others. Derangement of mental faculties does not incapacitate one, under our laws, from making a will, if it does not render him unable to transact his ordinary business, and incapable of understanding the extent of his property and of *appreciating the natural objects of his bounty.*''

In Bounds v. Johnson (Mo.), 192 S. W. 972, the court said: ''Counsel for plaintiffs make the point that it may be conceded that a person may be perfectly sane upon all subjects except one, yet, if that one was present in the mind of the testator at the time of the execution of a will, and operated upon, controlled, and caused him to make it, which he otherwise would not have done, then such a will would be void in the same degree as if the testator had been insane upon all subjects. . . . [Holton v. Cochran, 208 Mo. 314, 421, 106 S. W. 1035.] That is unquestionably a correct abstract proposition of law.'' [See Knapp v. Trust Co., 199 Mo. 640, 667, 98 S. W. 70.]

As we understand the law, the delusion which makes a testator incapable of making a will must be a delusion as to or affecting some matter necessarily involved in the making of a will, and not as to some extraneous or collateral matter or fact. An insane delusion is defined to be a false and fixed belief not founded on reason and incapable of being removed by reason. One of the requisites of a sound mind in making a will is that the testator is able to remember and appreciate the natural ties of kinship, and if it be shown that a person making a will is possessed of an insane delusion as to any person who is the natural object of his bounty, rendering him incapable of appreciating and responding to the natural impulse, then such person is incapacitated to make a will.

If Julia E. Hall was mentally incapable to make a will, it was because she possessed an insane delusion as to her brothers with respect to their treatment, neglect, and lack of brotherly affection toward her and toward her mother. It is plaintiffs' contention, and to that end most of their evidence is directed, that Julia E. Hall, during the last two or three years of her life, without any reason and contrary to the fact, and without any cause inducing such belief, was possessed of an insane delusion that her said brothers had

lost their brotherly feeling and love for her, had mistreated and neglected her and her mother, were dishonest with them, and had refused to help her in supporting and caring for her mother. One doctor testified, when asked if testatrix's mind was unbalanced, that he would not say that all her faculties were unbalanced, but that certain faculties were unbalanced; that she was a monomaniac; that a person may be perfectly rational in one faculty and abnormal and unbalanced in another, and that was her condition. Another medical expert testified that in his opinion a person who is able to take care of her property, knows how she wants to manage it, knows to whom she wants to leave it, and has perfect mental ability to know what she wants to do with her property and to transact her business and teach school, may yet be insane. This conclusion was evidently reached on the theory that testatrix was possessed of an insane delusion.

It seems to be well settled that wills may be set aside on the ground that while the testator is mentally capable in other respects, he is possessed of an insane delusion as to some matter involved in the making of the will. [Clingenpeel v. Citizens Trust Co. (Mo.), 240 S. W. 177; Evans v. Partlow, 322 Mo. 11, 16 S. W. (2d) 212, 215; Bounds v. Johnson (Mo.), 192 S. W. 972; Buford v. Gruber, 223 Mo. 231, 122 S. W. 717; Benoist v. Murrin, 58 Mo. 307.]

A reference to the petition in this case, the material parts of which are heretofore set out, shows, however, that the question of testatrix being incompetent to make a will because of an insane delusion as to her brothers or their treatment of her and her mother is not raised by the petition. The charge with reference to mental incapacity is couched in the general charge that testatrix was at the time of making the will "of unsound mind and memory to such a degree and so mentally infirm that she was incapable of making a will," and "was so unbalanced and incapacitated that she did not possess sufficient testamentary capacity to make a will." The only intimation in the petition that testatrix was possessed of an insane delusion as to her brothers and their treatment of her is contained in the charge that the will was *procured to be made by the use of undue influence* "by encouraging the deceased into a false belief that she had a grievance or grudge against plaintiffs." Even if this could be construed as in any way charging that testatrix was dominated and controlled by an insane delusion as to her brothers, it is merely alleged to have been one of the means used by those charged with procuring the will by undue influence in accomplishing that result. There is clearly no evidence that the will was procured by undue influence by the use of this or any other means. The whole issue of undue influence was rightly taken from the jury for want of evidence to sustain the same, and nothing was left but the general charge of want of mental capacity to make the will. No other is-

sue could properly be submitted to the jury. Insane delusions of the testatrix, in order to be an issue in the will contest, must be alleged in the petition as a ground for setting aside the will. It is so held in Adams v. Kendrick, 321 Mo. 310, 11 S. W. (2d) 16, 22, where the court held that where a single insane delusion, to-wit, as to the legitimacy of a named child, was alleged in addition to a general charge, of mental incapacity, the court could not enlarge the issues either by the admission of evidence or by the instructions so as to cover other insane delusions. The court held that "an insane delusion must be pleaded." In holding that the court erred in not sustaining a demurrer to the evidence, the court necessarily meant that there was no substantial evidence to support the issues presented by the pleadings, and for this, if for no other reason, the court correctly so ruled.

The pleadings and proceedings in this case are similar to those in Story v. Story, 188 Mo. 110, 117, 86 S. W. 225, where the plaintiff attacked the will on the ground of unsoundness of mind, using undue influence, and procuring the will to be made by fraud, which fraud, the court said, "is described and given earmarks by the pleader as follows: 'In that he . . . made false impressions upon the mind of said deceased, with the intent and effect of causing him to hate all the others of his said children and grandchildren who were his heirs at law and entitled to his bounty.' " As to this the court then said: "It is also fundamental that if the pleader identifies the fraud (undue influence in this case) by a specification, he is held to the precise specification pleaded. Viewing the allegation of fraud in the petition, together with the specification, . . . examination shows the record barren of any testimony tending to show that Story was guilty of any word or of any deed calculated to make 'false impressions upon the mind of said deceased, with the intent and effect of causing him to hate all the others of his said children and grandchildren who were his heirs at law and entitled to his bounty,' as averred in the petition. . . . So that the will cannot be upset on the ground of fraud (undue influence in this case) in its genesis." So here the record is barren of any testimony that any of the defendants were guilty of any word or deed calculated to "encourage the deceased into a false belief that she had a grievance or grudge against the plaintiffs," as charged in the petition; and that is the sum total of the charge in the petition even hinting at an insane delusion. Whatever issue, if any, there is in this case as to an insane delusion is bound up with and part of the charge of undue influence and perishes with it.

In this connection the court, by plaintiffs' Instruction B, in part told the jury: "And if you believe from the evidence that at the time of signing the paper writing in question, said Julia E. Hall

had and was possessed of or by an insane delusion or delusions and was so dominated and affected mentally thereby as to be insane, that is, not of sound mind within the definition and meaning stated and defined in these instructions, then your verdict must be that said paper writing is not the last will and testament of said Julia E. Hall.'' This instruction is entirely too broad, even if such issue had been raised, in not confining the insane delusion to that relating to the treatment of her brothers toward her and her mother, and permits the jury to speculate and set aside the will if it found that Julia E. Hall was possessed of *any* insane delusion. The fact that testatrix in her later life became an attendant at the Christian Science Church and believed to some extent at least in the teachings of that church as to healing diseases may have been regarded by some juror as an insane delusion.

And by Instruction C the court instructed the jury to find against the will if they found that the testatrix was mentally incompetent on account of ''an insane delusion, if any, of and concerning her brothers and *mother*.'' Whatever we might say as to testatrix being possessed of an insane delusion as to her brothers, we are quite sure there is no sufficient evidence as to her having any such insane delusion as to her mother. The will itself refutes any such idea as testatrix made ample and generous provision for her mother in the will in question. While there is some evidence that during the last two or three years of her life (the time fixed by the plaintiffs as to her entertaining the fixed and abiding delusion that they had neglected her and her mother, had mistreated and been dishonest with them, and failed to help her in caring for her mother), the testatrix brooded over and continuously kept complaining of her imaginary wrongs, at times becoming demonstrative, if not hysterical, in her complaining and refusing to listen to reason on that subject; yet this did not apply to her mother. The most that can be said as to her feelings toward and as to the treatment of her mother is that on rare occasions she became impatient and somewhat petulant at her and told her to ''shut up'' or used some such expression when her mother wanted to talk at the same time she was talking or became vexed and manifested her vexation at her for some trivial cause. It is not to be wondered at, however, that this daughter at times thought her lot a little hard and made some complaint that she was compelled to deprive herself of much of her freedom and the pleasures of life because of the confining care of her aged mother. The overwhelming evidence is that she was devoted to her mother, had the strongest affections for her, and when the last hours of testatrix were at hand, and with her last breath, she, as well as the mother, showed the warmest affections for each other. The question of testatrix being possessed of an abiding insane delusion toward her mother was not

supported by the evidence and should not have been submitted. These are errors justifying the court in granting a new trial, though not mentioned in the court's order.

█ The court instructed the jury that the burden of proving by a preponderance of the evidence that the testatrix was of sound mind when she signed the paper writing in question rested on defendants throughout the case. That this is the law of this State seems to be settled. [Goodfellow v. Shannon, 197 Mo. 271, 279, 94 S. W. 979; Major v. Kidd, 261 Mo. 607, 625, 170 S. W. 879; Smarr v. Smarr, 319 Mo. 1153, 1165, 6 S. W. (2d) 860.] This, however, applies to soundness of mind in its ordinary and general sense and to those cases where the usual test of a capable mind applies, that is, that the testator have a mind and memory sufficient to understand the ordinary affairs of life, the general value, nature and extent of his property, the number and names of those who are the natural objects of his bounty, knows the nature of the business in which he is engaged, and knows to whom he wishes to give his property at his death, but not to insane delusions. The burden of proving mental capacity to the extent mentioned rests on the proponents of the will, not only in making a prima facie case, but throughout the whole case, and such is the instruction here. We do not, however, think that the proponents of a will are required to prove in the first instance, or carry the burden throughout the trial, that the testator was free of insane delusions. We think that if plaintiffs rely on proving insane delusions as avoiding the will, they must allege and prove the same, and the burden is on them to do so, as it is with reference to undue influence. As this was the only real issue in the case, this instruction was calculated to impress the jury that the burden was on defendants, in proving testatrix to be of sound mind, to carry the burden of proof as to her not having an insane delusion.

Recurring again to the question whether there is any substantial evidence in the record warranting a finding against the will because of mental incapacity, including insane delusions, it is not necessary for us to decide that question and we cannot now do so finally. The trial court granted a new trial, and, from what we have said, such order must be affirmed and a new trial had if plaintiffs so desire. The evidence may be different on another trial and this decision can apply only to the evidence as now presented. On another trial the issue of undue influence will likely go out of the case and with it much irrelevant evidence bearing on that subject only. The pleadings will likely be reformed and will present the question of an insane delusion as the dominant, if not exclusive, issue, though such is a species of insanity or unsoundness of mind.

█ The question which has given us the most serious trouble is whether the medical evidence, mostly of an expert nature on a

long hypothetical question, to the effect that, in the opinion of medical experts, testatrix was of unsound mind, does not furnish some substantial evidence sufficient to take this question to the jury. However, the question of mental capacity to make a will is a mixed question of law and fact, and the facts on which an opinion, even of a medical expert, is based must, like the facts sufficient to support the verdict of the jury, measure up to the legal requirements. The question whether such opinion is based on and supported by sufficient facts or evidence to sustain the same is a question of law for this court. This court has a number of times held that the evidence as to unsoundness of mind is insufficient to support a verdict, though medical experts so testified.

In Berkemeier v. Reller, 317 Mo. 614, 645, 296 S. W. 739, the court said: ''It was for the jury to say how nearly the hypothetical question reflected the personality and conduct of the subject, correctly, and as described in the testimony of the witnesses other than the expert. But, the court also heard the testimony. The court, in passing upon the demurrer of defendants, and in reconsideration of the question upon the motion for a new trial, inevitably and properly had under consideration all the evidence; and, in view of all the evidence made its ruling. Having heard not only the opinion of the expert, and his reason for it, but also the testimony upon which the hypothetical question purported to rest, the court concluded that all of it together lacked probative force to show mental incapacity to make a will. We conclude that the court did not err in so holding.''

In Winn v. Grier, 217 Mo. 420, 455, 117 S. W. 48, the court, referring to Archambault v. Blanchard, 198 Mo. 384, 95 S. W. 834, said: ''In that case, as in the Sayre case, notwithstanding the testimony of the expert witnesses and the many eccentricities and peculiarities of the testator as testified to by the witnesses, it was held that there was no substantial evidence on which to authorize a submission of the case to the jury.'' The case referred to is Sayre v. Trustees of Princeton University, 192 Mo. 95, 128, 90 S. W. 787, heretofore quoted.

One of the doctors in this case qualified his statement that in his opinion the testatrix was insane by saying that he considered insanity as ''meaning a more or less departure from the normal manner of thinking, feeling and acting,'' which is far from measuring up to the legal standard in will cases.

All that we now say is that if on another trial the evidence of contestants is no stronger than as now presented, the court should sustain a demurrer and direct a verdict for defendants. Many other matters are discussed in the briefs and have been considered, but the length of this opinion is an excuse for not discussing these other matters.

The result is that the order of the trial court sustaining the motion for new trial is affirmed and the cause remanded. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All of the judges concur, except *Hays, J.,* not voting because not a member of the court when cause was submitted.